NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13043

COMMONWEALTH  vs.  PETER RONCHI.


Essex.      October 13, 2022. - February 14, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Wendlandt, JJ.


Homicide.  Evidence, Prior misconduct, Pattern of conduct,
     Expert opinion, Intent.  Intent.  Practice, Criminal,
     Capital case, Argument by prosecutor, Instructions to jury,
     Jury and jurors, Deliberation of jury.  Jury and Jurors.



     Indictments found and returned in the Superior Court
Department on August 21, 2009.

     The cases were tried before David A. Lowy, J.


     Neil L. Fishman for the defendant.
     Marina Moriarty, Assistant District Attorney, for the
Commonwealth.


     GAZIANO, J.  On the evening of May 16, 2009, the defendant

repeatedly stabbed his nine months pregnant girlfriend, Yuliya

Galperina, killing her and her viable fetus.  At trial, there

was no dispute that the defendant had stabbed Galperina; the

primary issue before the jury was whether the fatal stabbing had

been mitigated by heat of passion upon reasonable provocation so as to reduce the defendant's liability from murder to manslaughter. The basis for the provocation, the defendant argued, was Galperina's (false) disclosure that he was not the father.

A Superior Court jury convicted the defendant of two counts of murder in the first degree. In this appeal, the defendant argues that the evidence was insufficient to support his convictions of murder in the first degree, on the ground that no rational juror could have found that the stabbings were not the result of a heat of passion upon reasonable provocation. The defendant also argues that he cannot, as a matter of law, be held liable for the death of the full-term fetus because he did not stab or injure the fetus, who died due to loss of maternal blood circulation. In addition, the defendant challenges certain of the judge's evidentiary rulings, statements in the prosecutor's closing argument, and the discharge of a deliberating juror. The defendant also asks this court to exercise its extraordinary authority under G. L. c. 278, § 33E, to reduce the verdicts to manslaughter.

For the reasons that follow, we affirm the defendant's convictions and, after a thorough review of the entire trial record, decline to allow relief under G. L. c. 278, § 33E. We also take this opportunity to disavow our precedent on

reasonable provocation based on sudden oral revelations of infidelity, and, relatedly, lack of paternity.  See Commonwealth v. Schnopps, 383 Mass. 178, 180-182 (1981), S.C., 390 Mass. 722 (1984).

1.  Facts.  We recite the facts the jury could have found, reserving certain facts for later discussion of specific issues.

a.  Commonwealth's case.  In May of 2009, Galperina was living in an apartment in Salem with her eight year old son and three year old daughter; the apartment was on the fifth floor of a two-building complex.  Galperina and the defendant had been dating for approximately two years.  She was nine months pregnant, with a due date of May 21 or 22, 2009; the defendant was the father.

On Saturday, May 16, 2009, the defendant ate dinner and watched a movie at a friend's house in Gloucester.  He left at approximately 10 P.M.  The friend described the evening as ordinary and the defendant's demeanor as "pleasant" and "jovial."  Security surveillance footage at Galperina's apartment building showed the defendant entering the building at 10:16 P.M. and reaching the fifth-floor hallway at 10:17 P.M. The defendant left Galperina's apartment approximately ninety minutes later, at 11:46 P.M.  A neighbor, who lived two apartments away from Galperina, had heard a scream sometime between 11:30 P.M. and midnight.

At around 7:20 A.M. on the morning of May 17, 2009, Alvaro Espinal-Martes took the elevator to the fifth floor to get a ride to work from his friend and coworker. When the elevator door opened, he saw Galperina's distraught children in the hallway. One of the children grabbed his hand and led him to Galperina's apartment. Her body was on the living room floor, bloody and covered with a sheet. Espinal-Martes brought the children to his friend's nearby apartment and called 911.

First responders observed Galperina lying on her back next to a futon, covered in a sheet. She had lacerations to her torso, and blood was splattered on the furniture, the floors, and the walls. In the bathroom, police found a pair of blood-soaked pants on the floor and bloodstains on the sink, faucet, and toilet.

An autopsy revealed that Galperina had sustained at least fifteen stab wounds, including wounds to the back of her head, upper chest, and back. She died of blood loss from the multiple stab wounds to her neck and torso. The fetus was full term and would have been capable of surviving outside the uterus. The fetus had not been stabbed; the cause of death was "loss of maternal [blood] circulation due to stab wounds to the mother."

On May 17, 2009, at approximately 4 P.M., the defendant approached a uniformed police officer outside a Norwalk, Connecticut, police station. The defendant was sobbing and

asked the officer for help. He told the officer that he had had a nightmare in which "he killed his eight-and-a-half-month pregnant girlfriend." The defendant then explained to that officer, and others who had joined them, that it was actually not a nightmare at all. The defendant said that he had killed his girlfriend in Salem, Massachusetts, with a knife, but had left her children unharmed. He placed a blanket over Galperina so that her children would not see her when they awoke. The defendant then drove to Norwalk and parked at a discount department store. He left the knife he had used in the stabbing in his minivan, purchased a bicycle, and rode around until he reached a police station. The defendant told the officers that he was not a "bad guy," and that he had stabbed his girlfriend because she told him that he was not the father of her baby.

After the defendant was arrested, police obtained a warrant to search his house and the minivan. They found a pair of bloodstained white sneakers and a jacket with bloodstains inside one of the sleeves in the defendant's living room.[1] Inside the

---

[1] Police also found a ripped-up letter with the words "Last Will and Testament" in a waste basket in the defendant's home office. The letter was dated May 14, 2009, and stated: "I wish to leave all my assets to my two children. . . . It is my understanding and hope that the trust . . . will be of benefit to [them], as well, and they will be the sole beneficiaries of the trust." The torn-up pieces of paper did not include a bequest for the expected child. The defendant testified that he had planned to update his will, and introduced another note dated May 14, 2009, which said, "Once my unborn son . . . is

minivan, investigators found a bloodstained knife and sheath in the driver's door compartment.  There was occult blood on the driver's door handle and seatback.  Deoxyribonucleic acid (DNA) testing on the sneakers, the knife, and the sheath, according to the Commonwealth's expert, matched Galperina's genetic profile. The knife handle and the bloodstain on the jacket each contained a mixture of DNA from Galperina and the defendant.[2]

b.  Defendant's case.  As stated, the theory of defense was that the defendant stabbed Galperina in the heat of passion following her announcement that he was not the baby's father, and that he lacked the intent for premeditated murder.

The defendant testified in his own defense.  He said that he met Galperina in 2006 and they began an intimate relationship.  At first, they agreed to use birth control.  In 2008, Galperina told the defendant that she was pregnant.  This

---

born, I would like him to get a quarter of these assets, and to have this administered by his mother."  The defendant also said that he intended to provide for the child by purchasing a life insurance policy.

[2] In Commonwealth v. Mattei, 455 Mass. 840, 851-853 & n.25 (2010), this court concluded that testimony that a DNA "match" exists is inadmissible without accompanying statistical interpretation of the likelihood of that match by an expert. Here, however, the expert testified, without objection, that "[t]he major DNA profile matched the DNA profile of Yuliya Galperina."  We conclude that, in these circumstances, there was no substantial likelihood of a miscarriage of justice from the expert's unobjected-to use of the word "match" without further discussion of the underlying statistics.  See, e.g., Commonwealth v. Seino, 479 Mass. 463, 469-472 (2018).

upset the defendant, because he did not think they were ready to have a baby, and they had agreed they would not. The two split, and soon thereafter Galperina learned that she in fact was not pregnant.

Galperina and the defendant reconciled, and then they decided to have a child together. The defendant testified that he changed his mind because he "loved [Galperina] very much." He went with her to prenatal appointments, displayed an ultrasound image of the fetus in his living room, and purchased a changing table. He also kept a file of things having to do with his expected child, and he had chosen a name for the child. The defendant said that he and Galperina had agreed to "raise the child as we were a married couple. We were both going to participate in the raising of the child . . . equally."

During the course of her pregnancy, the defendant and Galperina nonetheless had several disagreements concerning her parenting practices and, in particular, her use of natural and traditional remedies. The defendant pointed out that she left her young children unattended, failed to dress them in clothing appropriate for the weather, and allowed them to play in the rear seat of a moving vehicle while they were not wearing seatbelts. The defendant also disliked that Galperina brought her daughter to an unqualified healer to treat a learning disability. Galperina consumed "all kinds of weird

concoctions," including large doses of raw apricot seeds, that the defendant believed were toxic and potentially harmful to their child. Galperina refused to allow the defendant to take the baby to meet his family until the baby was three months old, because her ethnic tradition required that a newborn child be isolated from visitors for the child's protection. As her due date approached, Galperina acquiesced to several of the defendant's demands; she promised to take the child to a conventional holistic pediatrician, and to permit State-mandated vaccinations.

The defendant also testified that he usually visited Galperina on Saturday nights and carried a hunting knife for his own protection. He believed that her apartment building was in a "potentially dangerous area," and had seen groups of young and "seedy looking" individuals gathered around the entrance to the building. When he visited Galperina for the last time, he was carrying a knife in his coat pocket.

On that evening, he arrived at around 10 P.M. They discussed the pending birth, and Galperina said that she no longer wanted the baby to be vaccinated. The defendant was annoyed that she was reneging on their agreement. She further angered the defendant by telling him that she had paid one hundred dollars to the natural healer for the baby's care. She added that she had ignored his advice and had consumed a large

number of apricot seeds, and she insisted that the baby could not visit with the defendant's family as a newborn.  These statements made the defendant "quite angry," and he raised his voice.  He announced that he was leaving because he was not being allowed to make "any decisions about the baby," and he put on his coat.  The defendant told Galperina, "I'm leaving you and I'll send you money."  She replied, "Don't even bother sending the money.  It's not your child."

The defendant testified that he felt anger, rage, and betrayal.  He "lost it" and blacked out.  His next memory was being in the bathroom, covered in blood and holding a knife.  "It was, like, waking up.  I had the knife in my hand and there was blood everywhere."  He removed his bloodstained pants, dressed in a pair of pants he found in a hamper, kissed Galperina, covered her up with a sheet, and left the apartment.

The defendant introduced expert testimony to establish that the killing was mitigated by a fragile mental state.  Dr. Thomas Deters, a neuropsychologist, conducted a comprehensive examination of the defendant.  Deters interviewed the defendant a number of times, administered a battery of tests, reviewed police reports and statements, and interviewed the defendant's relatives and friends.  Deters noted that the defendant suffered head trauma as a young child and as an adolescent, as well as from playing soccer in college.  Multiple stressors affected the

defendant's mental functioning at the time of the stabbing; these included the recent death of his mother, his strained relationship with his brother, a loss of employment, isolation from his children, and Galperina's refusal to allow him to coparent.

Deters diagnosed the defendant as suffering from numerous neurological impairments, including Asperger's syndrome, anxiety disorder, mood disorder, personality disorder, major depression, sleep disorder, and prefrontal lobe abnormalities. As a result of these illnesses, Deters opined, the defendant was unable to act appropriately when confronted with a stressful situation. Deters believed that, at the time of the stabbing, the defendant had been unable to weigh the consequences of his actions or to appreciate the cruelty of his actions. The defendant's mental impairments made him susceptible to an enraged response to provocation.

In rebuttal, the prosecutor introduced testimony by Dr. Tali Walters, a forensic psychologist. Based on her interview of the defendant, and her examination of the police reports and the defendant's statements, Walters testified that the defendant did not have a mental illness. It was her opinion that he had no impairments that would affect his ability to reflect coolly, to premeditate, or to form an intent to kill.

2. Prior proceedings. In August of 2009, a grand jury returned indictments charging the defendant with two counts of murder in the first degree in connection with the deaths of Galperina and "Baby Boy Galperina." Beginning on October 9, 2012, the defendant was tried before a Superior Court jury. The Commonwealth proceeded on theories of deliberate premeditation and extreme atrocity or cruelty for the death of Galperina, and deliberate premeditation for the death of her fetus. On November 8, 2012, a Superior Court jury convicted the defendant of two counts of murder in the first degree, under each of the theories alleged by the Commonwealth.

3. Discussion. The defendant argues that his convictions of murder in the first degree should be vacated because no rational juror could have found the absence of heat of passion upon reasonable provocation based on the revelation of his lack of paternity. The defendant also maintains that his conviction for the death of the fetus cannot stand because the common-law rule of liability for the death of a viable fetus, see Commonwealth v. Cass, 392 Mass. 799, 805-807 (1984), is based on the direct infliction of prenatal injuries. Accordingly, he contends, he cannot be liable for murder where the fetus died as a result of maternal blood loss. The defendant further argues that the conviction was not supported by sufficient evidence,

because the Commonwealth did not prove an intent to kill the fetus.

In addition, the defendant maintains that a number of other errors at trial mandate that he receive a new trial. He challenges several of the judge's evidentiary rulings, including the exclusion of pattern evidence to demonstrate that Galperina told another intimate partner that he was not the father of another of her children; the denial of the defendant's motion to introduce expert testimony on his mental state, in reliance on Commonwealth v. Jaime, 433 Mass. 575, 577-578 (2001), and Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531-532 (1986); and the denial of a motion to strike Walters's testimony due to its lack of scientific reliability.

The defendant also asserts that the prosecutor's reference in her closing argument to "transferred intent" created a substantial likelihood of a miscarriage of justice, and that the conviction of murder of the fetus was predicated on an erroneous jury instruction that lessened the Commonwealth's burden to prove that the fetus had been viable. In addition, the defendant argues that the judge erred in dismissing a deliberating juror. Finally, the defendant asks us to exercise our extraordinary authority, pursuant to G. L. c. 278, § 33E, to reduce the degree of guilt in the interest of justice, due to the mitigating circumstances of a crime of passion.

a.  Heat of passion upon reasonable provocation.  The defendant contends that this was a case of manslaughter, not murder, and that no reasonable juror could have found, beyond a reasonable doubt, the absence of the mitigating circumstance of heat of passion upon reasonable provocation, based on the combination of Galperina's "extraordinary provocations" and his fragile mental state.

An intentional killing that otherwise would be murder may be reduced to voluntary manslaughter where there are extenuating circumstances, such as "sudden passion based on provocation." See, e.g., Commonwealth v. Whitman, 430 Mass. 746, 753-755 (2000), and cases cited ("Voluntary manslaughter is an intentional killing in the heat of passion as a result of severe provocation" [citation omitted]).  In general, words alone are not sufficient provocation to reduce the crime of murder to manslaughter.  Commonwealth v. Anderson, 396 Mass. 306, 314 (1985).  "[V]erbal insults and arguments, even if obscene or hostile, cannot constitute sufficient provocation, for a reasonable person 'can be expected to control the feelings aroused' thereby" (citation omitted).  Commonwealth v. Estremera, 383 Mass. 382, 392 (1981).  See, e.g., Commonwealth v. Vatcher, 438 Mass. 584, 589 (2003) (eleven year old physically challenged victim's extended temper tantrum, "however frustrating, annoying, and even infuriating his behavior, . . .

did not rise to 'adequate provocation'"); Commonwealth v. Groome, 435 Mass. 201, 219-222 (2001) (victim's revelation that she had acquired immunodeficiency syndrome and probably had transmitted disease to defendant was insufficient to support instruction on voluntary manslaughter); Commonwealth v. Masello, 428 Mass. 446, 449 (1998) (heated argument was insufficient to constitute adequate provocation); Commonwealth v. Seabrooks, 425 Mass. 507, 514 (1997), S.C., 433 Mass. 439 (2001) (false accusation of crime was insufficient to establish adequate provocation); Commonwealth v. Burke, 376 Mass. 539, 542-543 (1978) (defendant was not entitled to instruction on provocation where he told victim that he loved her, and she responded with expletive and words of rejection).

An exception to this rule exists, however, "where the words convey inflammatory information to the defendant." Commonwealth v. Mercado, 452 Mass. 662, 671 (2008). "[T]he existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather than from personal observation. If the information conveyed is of the nature to cause a reasonable person to lose his self-control and did actually cause the defendant to do so, then a statement is sufficient." Groome, 435 Mass. at 220-221, quoting Model Jury Instructions on Homicide 28-29 (1999).

An even more narrow exception is applicable where the words constitute a "peculiarly immediate and intense offense to [one's] sensitivities." Commonwealth v. Bermudez, 370 Mass. 438, 440-442 (1976). We have deemed a sudden oral revelation of infidelity inflammatory information sufficient to constitute such provocation. See, e.g., Commonwealth v. LeClair, 445 Mass. 734, 741-743 (2006); Schnopps, 383 Mass. at 180-182. Contrast Commonwealth v. Gulla, 476 Mass. 743, 748-749 (2017) (defendant's prior knowledge of infidelity precluded claim of sudden discovery). See also 2 W.R. LaFave, Substantive Criminal Law § 15.2(b)(5), at 500 (2d ed. 2003) ("a sudden confession of adultery by a wife, or information from a third person that a wife has been unfaithful, has sometimes been held to constitute a provocation to the husband of the same sort as if he had made an 'ocular observation' of his wife's adultery").[3]

To be sufficient to establish reasonable provocation, the words must comprise sudden knowledge; an actual confirmation of

---

[3] In some other States, a verbal revelation of infidelity falls within the general rule that mere words are insufficient to establish reasonable provocation. In those cases, reasonable provocation requires that a defendant catch the other spouse and the spouse's paramour in the act. See, e.g., Luch v. State, 413 P.3d 1224, 1230 (Alaska Ct. App. 2018) (common law requires defendant find spouse in very act of committing adultery); People v. Chevalier, 131 Ill. 2d 66, 76 (1989) (only discovery of parties in act of adultery or immediately before or after act will suffice as provocation); State v. Thomas, 169 Iowa 591, 598 (1915) (adequate provocation existed where act of adultery committed in presence and sight of defendant).

a suspicion of infidelity is not sufficient.  See Schnopps, 383 Mass. at 181-182 (new trial was required where judge declined to give instruction on manslaughter because there was conflicting evidence whether defendant had just learned of wife's infidelity or had known of it for months); Bermudez, 370 Mass. at 440-442 (no instruction on reasonable provocation was warranted where defendant had been separated from wife for three weeks and she made hostile and "obscene" statements telling defendant of her infidelity when he went to visit her to see their baby, but holding that "[t]he existence of sufficient provocation is not foreclosed absolutely because a defendant learns of a fact from oral statements rather than from personal observation. . . .  A reasonable man can be expected to control the feelings aroused by an insult or an argument, but certain incidents may be as provocative when disclosed by words as when witnessed personally.  Therefore, we leave open the possibility that, in an appropriate case, testing the defendant's response on an objective standard, sufficient provocation may be found in information conveyed to a defendant by words alone").  Compare Mercado, 452 Mass. at 672 (no reasonable provocation where defendant had suspected for some time that wife had been unfaithful); Commonwealth v. Andrade, 422 Mass. 236, 237-238 (1996) (no reasonable provocation where defendant had suspected for several weeks that wife had been unfaithful, even though he

had confirmed his suspicion less than seven hours before killing her).

Accordingly, based on our existing jurisprudence on manslaughter, the defendant had grounds upon which to argue that the Commonwealth failed to establish that there were no mitigating circumstances that would reduce the stabbing here from murder to manslaughter, see Bermudez, 370 Mass. at 440-442, and the judge properly instructed on manslaughter due to heat of passion, see Commonwealth v. Brown, 387 Mass. 220, 227 (1982), quoting Commonwealth v. LePage, 352 Mass. 403, 419 (1967) (manslaughter instruction must be given where "any view of the evidence will permit a finding that the offence is manslaughter and not murder").  The defendant's argument before us, however, rests on viewing the evidence in the light most favorable to him, rather than, as we must consider it when analyzing a question of sufficiency, in the light most favorable to the Commonwealth.  See, e.g., Hrycenko v. Commonwealth, 459 Mass. 503, 510-511 (2011).

Notwithstanding the testimony that the defendant highlights, the jury were free to disregard his explanation that "he lost it" upon hearing that he was not the father of the fetus.  See Commonwealth v. Ehiabhi, 478 Mass. 154, 166-167 (2017).  The jury reasonably could have adopted the Commonwealth's theory that the defendant got into a heated

argument with his girlfriend, formed an intent to kill her and her fetus, and stabbed her multiple times in the area of her vital organs, in accordance with that plan.  See Commonwealth v. Burgess, 450 Mass. 422, 432 (2008) (deliberate premeditation matter of logical sequence not necessarily time).  These were questions of fact reserved for a fact finder properly instructed on the crimes of murder and voluntary manslaughter.  We discern no basis in this record to second guess the jury's determination.

We also take this opportunity to address the question whether our jurisprudence on manslaughter should continue to recognize oral revelations of infidelity as a basis for reasonable provocation.  In Commonwealth v. Steeves, 490 Mass. 270, 292 n.12 (2022), we "express[ed] serious doubt about the ongoing viability of this legal principle, where it rests on the outmoded perception that '[t]he killing of a spouse (usually a wife) by a spouse (usually a husband)' is 'an acceptable response to the discovery of infidelity,' thereby 'reinforc[ing] male irrationality as normal, and legitim[izing] the view of women as property'" (citation omitted).  Likewise, in State v. Shane, 63 Ohio St. 3d 630, 637 (1992), the Supreme Court of Ohio observed that the doctrine "has its foundation in the ancient common-law concept that the wife is the property of the husband":  "[w]hen a man is taken in adultery with another man's

wife, if the husband shall stab the adulterer, or knock out his brains, that is bare manslaughter; for jealousy is the rage of a man, and adultery is the highest invasion of property" (citation omitted). The court concluded that "[t]his archaic rule has no place in modern society." Id.

We conclude that the exception in the Commonwealth to the mere words rule for sudden oral revelations of infidelity has run its course. The exception rests upon a shaky, misogynistic foundation and has no place in our modern jurisprudence. Going forward, we no longer will recognize that an oral discovery of infidelity satisfies the objective element of something that would provoke a reasonable person to kill his or her spouse.

By today's ruling, however, we do not foreclose the possibility of sufficient provocation caused by learning of other types of information of a "nature to cause a reasonable person to lose his self-control" (citation omitted). Groome, 435 Mass. at 220. It is difficult, given the vagaries of human conduct, to delineate all of the exceptions to the general rule that mere words are insufficient to constitute reasonable provocation. In each case, the trial judge must consider whether the particular information conveyed to the defendant was sufficient to warrant an instruction on voluntary manslaughter. See Commonwealth v. Felix, 476 Mass. 750, 756-757 (2017) (discussing judge's duty to provide instruction on reasonable

provocation where precipitating event would have provoked heat of passion in ordinary person); Commonwealth v. Camacho, 472 Mass. 587, 602 (2015) (instruction on reasonable provocation is warranted if there is evidence deemed legally sufficient to cause accused to lose self-control in heat of passion). See also Commonwealth v. Pina, 481 Mass. 413, 422 (2019) (instruction on manslaughter is required if evidence, considered in light most favorable to defendant, would permit verdict of manslaughter, not murder).

b. Liability for death of viable fetus where fetus was not directly injured. At common law, the destruction of a fetus in utero was not a homicide. See Cass, 392 Mass. at 805. The issue "debated at common law" was whether criminal liability "might rest on a defendant's injuring a fetus in utero, where the fetus was later born alive, and then died of the injury without further guilty intervention by the defendant." Commonwealth v. Edelin, 371 Mass. 497, 512 (1976). See Dietrich v. Northampton, 138 Mass. 14, 15, 17 (1884) (discussing common-law "born alive" rule).

In Cass, 392 Mass. at 799, the court addressed whether a viable fetus is a "person" for purposes of the statute on motor vehicle homicide. See G. L. c. 90, § 24G (homicide by motor vehicle is defined, in part, as operating motor vehicle while under influence of intoxicating substances and by such operation

"caus[ing] the death of another person").  The court examined the foundation for the "ancient" rule that a fetus must be "born alive," and rejected this limitation to the statutory definition of a person.  See Cass, supra at 805-807.  The dominant rationale for the rule, the court noted, was the impossibility of determining whether "the fetus was alive when the accused committed his act."  Id. at 806 & n.5.  The better rule, the court held, "is that infliction of prenatal injuries resulting in the death of a viable fetus, before or after it is born, is homicide."  Id. at 807.  See Commonwealth v. Lawrence, 404 Mass. 378, 383-384 (1989) (extending liability for death of viable fetus to charge of involuntary manslaughter).

The defendant contends that "Cass does not apply to the circumstances at bar because the fetus did not suffer a prenatal injury."  The defendant emphasizes that the fetus was uninjured by the stabbing and died as a result of loss of maternal blood.  In the alternative, he urges this court to overrule Cass as an unlawful usurpation of the Legislature's authority to define criminal liability.

The defendant's contention that the fetus was uninjured by the stabbing of Galperina is strained at best.  Admittedly, none of the fifteen stab wounds was inflicted on or touched the fetus.  Nonetheless, the defendant committed an act of violence against a woman who was nine months pregnant, repeatedly

stabbing her in, among other areas, the torso, where the vital organs are located. By ending the mother's life, he destroyed the viable fetus through the cessation of life-sustaining maternal blood flow. See Cass, 392 Mass. at 807 ("If a person were to commit violence against a pregnant woman and destroy the fetus within her, we would not want the death of the fetus to go unpunished"). See also Commonwealth v. Crawford, 417 Mass. 358, 359 (1994), S.C., 430 Mass. 683 (2000) (upholding conviction of involuntary manslaughter where mother was killed by gunshot wound to face and viable fetus died of oxygen deprivation). Nothing in Cass, supra at 806-807, or our subsequent cases, requires that a viable fetus suffer a direct traumatic injury such as a gunshot wound or a stab wound.

The defendant also argues that we should overrule Cass as an inappropriate exercise of "raw judicial power." Relying on the dissent by Justice Wilkins, he argues that Cass is flawed because the court usurped the Legislature's exclusive authority to define criminal offenses and what conduct is punishable under the criminal law. The defendant appears to overlook Justice Wilkin's discussion of the court's expanded definition of the word "person" "in the construction of an exclusively statutory crime," motor vehicle homicide. Id. at 809 (Wilkins, J., dissenting). Here, the question is not the interpretation of a statutorily defined offense. At issue in this case is the

common-law definition of murder, a matter within the sole jurisdiction of this court. See Commonwealth v. Castillo, 485 Mass. 852, 865-866 (2020) (exercising court's authority to redefine homicide offense). Accordingly, the defendant's argument concerning the purported violation of the separation of powers is unavailing.

c. Evidence of deliberate premeditation with respect to fetus. The defendant also argues that the death of the fetus was "merely incident to and an unintentional byproduct of the death of Galperina." He contends that no rational juror could have found that he specifically intended to kill the fetus.

To convict a defendant of murder in the first degree on a theory of deliberate premeditation, the Commonwealth must prove that the defendant intentionally caused the death of the victim "after a period of reflection." Commonwealth v. Chipman, 418 Mass. 262, 269 (1994). "No particular period of reflection is required for deliberate premeditation to be found. . . . The law recognizes that a plan to murder may be formed within a few seconds." Id. See Model Jury Instructions on Homicide 46-47 (2018) (key is sequence of thought process).

In determining whether the Commonwealth met its burden to establish each element of the offense charged beyond a reasonable doubt, we rely on the familiar Latimore standard. See Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

"[The] question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 677, quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). Although a conviction may be based entirely on circumstantial evidence, and the inferences drawn need only be reasonable, not inescapable, see Commonwealth v. Rakes, 478 Mass. 22, 32, 45 (2017), a "conviction may not rest on the piling of inference upon inference or on conjecture and speculation," Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011), citing Commonwealth v. Swafford, 441 Mass. 329, 339-343 (2004).

Considering the evidence before the jury in the light most favorable to the Commonwealth, we conclude that the evidence would have permitted a reasonable juror to find, beyond a reasonable doubt, that the defendant deliberately intended to kill the fetus. By his own statements, the defendant was well aware of the correlation between Galperina's health and the health of the fetus. Among other things, he excoriated her for consuming what he viewed as toxic amounts of apricot seeds while she was pregnant. The defendant told the jury that he was furious at Galperina's revelation that he was not the father. Fueled by anger, he pulled a hunting knife from his coat pocket, removed the knife from its sheath, and stabbed her fifteen times

in the torso, the location of her vital organs, and in the back of the head and neck. The jury reasonably could have inferred that the defendant knew that by killing a woman who was nine months pregnant, he would end the life of the viable fetus carried in utero. See Commonwealth v. Whitaker, 460 Mass. 409, 419 (2011) (deliberate premeditation may be inferred from "nature and extent of a victim's injuries, the duration of the attack, the number of blows, and the use of various weapons").[4]

d. Evidentiary rulings. i. Exclusion of pattern evidence. The defendant sought to introduce evidence that, while she was pregnant with her daughter, Galperina told a former boyfriend that he was not the baby's father. The defendant argued that the evidence was admissible to show a pattern of misconduct, to corroborate his testimony that he had been "extraordinarily" provoked by Galperina, or to rebut the

---

[4] The judge imposed consecutive sentences for Galperina's death and the death of her fetus. The defendant contends that this sentencing scheme violated the prohibition against double jeopardy by imposing multiple punishments for the same offense, as well as the "the fundamental principle of the criminal law" that liability rests on a defendant's intent and the results of his or her actions. We discern no abuse of discretion. As discussed supra, the evidence before the jury would have allowed them to conclude beyond a reasonable doubt that the defendant was liable for the death of the fetus based on a finding that he specifically intended to kill the fetus. The judge had authority to impose consecutive sentences for the unlawful killings of a mother and her viable fetus. See Commonwealth v. Crawford, 417 Mass. 358, 359 (1994), S.C., 430 Mass. 683 (2000).

suggestion that he was fabricating the reason for that provocation.

Prior bad act evidence generally is inadmissible. See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014); Mass. G. Evid. § 404(b)(1) (2022). It may be admissible, however, to demonstrate a common scheme, pattern of operation, absence of accident or mistake, identity, or motive. Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006); Mass. G. Evid. § 404(b)(2). It was the defendant's burden, as the proponent of the evidence, to establish, by a preponderance of the evidence (1) that the act occurred; (2) that the prior bad act evidence pertained to some relevant issue at trial; and (3) that the prior event and the circumstances of the crime charged had a uniqueness or particularly distinguishing pattern of conduct common to the current and former incidents. See Commonwealth v. Leonard, 428 Mass. 782, 785-786 (1999). A judge may exclude prior bad act evidence if its probative value is outweighed by the risk of unfair prejudice. Commonwealth v. Almeida, 479 Mass. 562, 568 (2018). "Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the judge" and will not be disturbed absent clear error (citation omitted). Commonwealth v. Bryant, 482 Mass. 731, 735 (2019).

Following the defendant's motion, the judge conducted a voir dire hearing of the former boyfriend. The former boyfriend testified that he had been annoyed by Galperina's frequent contact with her son's father, who maintained a regular presence in his son's life. The former boyfriend asked Galperina "as a joke, 'Were you sleeping with him?'" Galperina replied, "Yes, and you know, the child I'm carrying is his." According to the former boyfriend, she said this once or twice "as a joke," and they both laughed.

The judge then excluded the proffered evidence about Galperina's statements to the former boyfriend on three separate grounds. First, he found that the prior comment did not establish a pattern (possibly because the testimony was that Galperina had been joking around, as compared to the volatile situation leading to her death). Second, the judge found that the defendant was attempting to introduce the evidence for impermissible propensity purposes. See Mass. G. Evid. § 404(b)(1). The judge commented, "[B]ased on this proffer, anything that could be taken from it, if anything at all, and really, nothing can, would be a propensity inference." Third, the judge found that the probative value of the statement was substantially outweighed by the risk of undue prejudice. We discern no abuse of discretion in the judge's decision to deny the introduction of the prior bad act evidence.

The judge also denied the defendant's request to extend Commonwealth v. Adjutant, 443 Mass. 649, 664 (2005), and to allow the admission of Galperina's statement as character evidence. See id. at 650, 663-664 (where issue of self-defense is raised and identity of first aggressor is in dispute, judge may allow introduction of evidence of specific incidents of violence initiated by victim even if incidents were unknown to defendant). The defendant argues that "[t]here is no reason why the same rule should not adhere here -- where the victim had a pattern of making identical extraordinarily provocative statements." Adjutant establishes an exception to our general rule prohibiting evidence of a person's character "to prove that on a particular occasion the person acted in accordance with the character or trait." See Mass. G. Evid. § 404(a)(1). "Our decision in the Adjutant case is specifically limited to situations where the defendant claims self-defense . . . ." Commonwealth v. Benoit, 452 Mass. 212, 228 (2008). See Camacho, 472 Mass. at 596 n.12 (Adjutant rule is not applicable to defense of another). We decline the defendant's invitation to extend the holding in Adjutant beyond its narrow exception.

ii. Exclusion of opinion testimony by defense expert. Prior to the testimony by Deters, the defendant's psychological expert, the judge reminded the attorneys that he intended to enforce this court's rulings in Jaime, 433 Mass. at 577-578, and

Department of Youth Servs., 398 Mass. at 531-532. "The purpose of this limitation on expert witness testimony is to prevent the proponent of the opinion from 'import[ing] inadmissible hearsay into the trial.'" Commonwealth v. Piantedosi, 478 Mass. 536, 543 (2017), quoting Commonwealth v. Goddard, 476 Mass. 443, 448 (2017).

Under that precedent, an expert's opinion may be based on "(a) facts observed by the witness or otherwise in the witness's direct personal knowledge; (b) evidence already in the record or that will be presented during the course of the proceedings, which facts may be assumed to be true in questions put to the witness; and (c) facts or data not in evidence if the facts or data are independently admissible in evidence and are a permissible basis for an expert to consider in formulating an opinion." Mass. G. Evid. § 703. See Commonwealth v. Barbosa, 457 Mass. 773, 784-785 (2010), cert. denied, 563 U.S. 990 (2011) (expert was prohibited from informing jury during direct examination about facts and data that were not in evidence, but such testimony would have been admissible with proper witness or with foundation that expert considered in forming opinion); Department of Youth Servs., 398 Mass. at 532 ("thrust of [our] rule is to leave inquiry regarding the basis of expert testimony to cross-examination").

The defendant objects to the judge's ruling that precluded Deters from testifying on direct examination to facts that were not in evidence, but upon which he had relied to form the basis of his opinion. The defendant argues that the judge's decision, which fully comported with the rules of evidence concerning expert opinion testimony, undermined Deters's testimony "by impeding its narrative flow and calling into question its credibility and reliability." The defendant maintains that the exclusion of certain of Deters's proffered testimony violated his right to a fair trial and to present a complete defense.

We do not agree. The judge's decision to exclude statements by Deters about the basis of his knowledge, where the facts upon which Deters relied were not in evidence, did not deprive the defendant of the ability to present a full defense. See Piantedosi, 478 Mass. at 543. "A defendant's right to present a full defense . . . is not without limits . . . , and as a general rule, does not entitle him [or her] to place before the jury evidence normally inadmissible" (quotation and citations omitted). Commonwealth v. Chappell, 473 Mass. 191, 204 (2015).

Deters testified to having reviewed thousands of pages of discovery interviewing the defendant for twenty-nine hours and conducting batteries of neurological testing, having interviewed the defendant's family members, and having reviewed the

substance of the defendant's medical history. Deters also referenced, as facts already in the record that underlay the bases of his opinion, the defendant's statements on direct and cross-examination, and the testimony of the defendant's brother, daughter, and ex-wife; an acquaintance; and a business associate. The direct examination of Deters included details concerning the defendant's medical history, educational background, career, major bouts of depression, panic attacks, sleep dysfunction, social isolation, stressors, and abnormalities of his prefrontal lobe.

iii. <u>Motion to strike certain testimony by Commonwealth's expert</u>. Walters, the Commonwealth's psychological expert, testified that the defendant was not mentally ill. The defendant moved to strike her opinion testimony on the ground that she did not frame her opinion as being held to a reasonable degree of psychological certainty. The judge denied the motion. He noted that, in the "ballistics case" -- <u>Commonwealth</u> v. <u>Pytou Heang</u>, 458 Mass. 827, 848-849 (2011) -- this court required that testimony be framed in that manner but has not done so in "any other situation." The defendant argues that this decision was error, because it "gave Walters'[s] opinion an air of certitude."

Because the defendant objected, we review for prejudicial error and consider whether there was a reasonable possibility

that the error contributed to the guilty verdicts. Commonwealth v. Carriere, 470 Mass. 1, 7 (2014).

A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify to an opinion if to do so would be helpful to the jury's understanding of the evidence "or to determine a fact in issue." Mass. G. Evid. § 702. See Commonwealth v. Hinds, 487 Mass. 212, 217 (2021) (role of expert witness is to help jurors understand evidence that lies outside their common experience). "[E]xpert witness testimony may be excluded as not probative of a material fact in dispute and thus of no assistance to the jury when it amounts to a mere guess or conjecture." Mass. G. Evid. § 702 note. See Kennedy v. U-Haul Co., 360 Mass. 71, 73-74 (1971) ("A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not trend toward that conclusion any more than toward a contrary one has no evidential value"). A decision to admit or to exclude expert testimony falls within the sound discretion of the trial judge and will not be disturbed unless it is an abuse of discretion. See Commonwealth v. Fitzpatrick, 463 Mass. 581, 603 (2012).

In general, no threshold level of certainty is required of an expert before the expert's opinion may be admitted at trial. See Commonwealth v. Torres, 469 Mass. 398, 407 (2014) ("expert opinion that is not definitive but expressed in terms of

observations being consistent with a particular cause, or words of similar effect, does not render the opinion inadmissible on the ground that it is speculative" [quotations and citation omitted]); Commonwealth v. Nadworny, 396 Mass. 342, 359-360 (1985), cert. denied, 477 U.S. 904 (1986) (pathologist's inability to testify to cause of death to reasonable degree of medical certainty did not render opinion inadmissible as speculative).  Cf. United States v. Mornan, 413 F.3d 372, 381 (3d Cir. 2005) (there is "nothing magical about the phrase, 'to a reasonable degree of scientific certainty'"); United States v. Cyphers, 553 F.2d 1064, 1072-1073 (7th Cir.), cert. denied, 434 U.S. 843 (1977) (no requirement that expert's testimony be expressed in terms of reasonable scientific certainty).

Undoubtedly, the phrase "reasonable degree of scientific certainty," or other forms of that phrase, is "a useful shorthand expression . . . helpful for forestalling challenges to the admissibility of expert testimony" (citation omitted). Anderson v. Paulo, 74 Mass. App. Ct. 635, 641 (2009).  See Commonwealth v. Roberio, 428 Mass. 278, 280 (1998), S.C., 440 Mass. 245 (2003) (psychologist testified to reasonable degree of scientific certainty that defendant suffered from three mental diseases or defects).  "[C]are must be taken," however, "to see that the incantation does not become a semantic trap and the

failure to voice it is not used as a basis for exclusion" (citation omitted). Anderson, supra.

The defendant contends that Pytou Heang, 458 Mass. at 848-850, mandates that "subjective expert opinion" be presented to a reasonable degree of certainty. We disagree. In that case, we discussed a significant challenge to the admissibility of forensic ballistics testimony in light of concerns "about both the lack of a firm scientific basis for evaluating the reliability of forensic ballistics evidence and the subjective nature of forensic ballistics comparisons." Id. at 837. We offered guidelines "to ensure that expert forensic ballistics testimony appropriately assists the jury in finding the facts but does not mislead by reaching beyond its scientific grasp." Id. at 846-847. The guidelines included a requirement that the expert's opinion be offered to a "reasonable degree of ballistic certainty." Id. at 848. Noting that other jurisdictions had come to different conclusions regarding the admissibility of such evidence, we struck a "middle ground" by permitting the introduction of an opinion that a match existed to a reasonable degree of ballistics certainty. Id. at 850.

Accordingly, we discern no prejudicial error arising from the judge's decision to deny the defendant's motion to strike Walters's testimony. We also decline to extend our decision in Pytou Heang to encompass all expert opinion testimony.

e.  Prosecutor's closing argument.  i.  Transferred intent.
As discussed, the defendant argues that a new trial is required
because "no rational juror could have . . . found, beyond a
reasonable doubt, that the defendant deliberately premeditated
and specifically intended the death of the fetus."  He also
argues that the prosecutor improperly raised the theory of
transferred intent in her closing argument, in an effort to
disguise the Commonwealth's lack of evidence as to the
defendant's intent.

The Commonwealth did not seek an instruction on transferred
intent, see generally Commonwealth v. Taylor, 463 Mass. 857, 863
(2012), with respect to the charge for killing the fetus.
Nonetheless, in her closing argument, the prosecutor suggested
that the jury infer that the defendant intended to kill the
fetus with deliberate premeditation based on the attack on
Galperina.  She argued:

> "And again, I don't want to tell you what premeditation is;
> the judge will instruct[] you on it.  But I'd suggest to
> you that from the evidence that you heard, the Commonwealth
> has proven premeditation.  As it relates to [Galperina] and
> her child, the intent that the judge will instruct you
> about is whatever intent you find is the intent that can be
> transferred to [Galperina's] child."

Because the defendant did not object to these statements, we
review to determine whether any error created a substantial
likelihood of a miscarriage of justice.  See Commonwealth v.
Wright, 411 Mass. 678, 681 (1992), S.C., 469 Mass. 447 (2014).

We analyze the prosecutor's statement "in light of the entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial" (quotation and citation omitted). Commonwealth v. Raposa, 440 Mass. 684, 694 (2004). The single passing reference to transferred intent consisted of one line in a closing argument that occupied twenty-six pages of transcript. The judge instructed the jury, before closing arguments were presented, that "the lawyers will, at some point in time, in order to structure their closing, inevitably be referencing the law. I will instruct you on the law. You must accept the law as I instruct you, whether you agree with that law or not."

In his final charge, the judge instructed that it was his responsibility to "teach [the jurors] the law that applies to the case." He also explained that the Commonwealth was required to prove, beyond a reasonable doubt, that the defendant deliberately premeditated the deaths of both Galperina and the fetus. The judge emphasized, "There are two separate indictments. One indictment alleges the murder of [Galperina], and one indictment alleges the murder of the fetus. You must consider these indictments separately and the Commonwealth has the burden of proving each element of the indictment or its lesser included offenses beyond a reasonable doubt." See Commonwealth v. Williams, 450 Mass. 645, 651 (2008) (jury are

presumed to follow judge's instructions).  Given the passing use of the term "transferred intent," its vagueness in the context of the closing argument as a whole, and the judge's instructions about the nature of closing arguments, we discern no substantial likelihood of a miscarriage of justice.

ii.  Statement that mere words cannot establish reasonable provocation.  The defendant contends that the prosecutor "wrongly" told the jury that mere words cannot furnish the provocation necessary for manslaughter.  In her closing, the prosecutor stated that "mere words are not enough, so that when [Galperina] says to [the defendant], 'It's not your baby,' the Commonwealth would say to you, mere words are not enough."  She added that "[t]he court will instruct you on that, so I'm not going to tell you what those words mean."

The defendant was not prejudiced by these statements.  The judge instructed that "[m]ere words, no matter how insulting or abusive, standing alone, do not constitute reasonable provocation."  See Model Jury Instructions on Homicide, supra at 77.  He explained:  "[T]he existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather than from personal observation.  If the information conveyed is of the nature to cause a reasonable person to lose his self-control and did actually cause [the defendant] to do so, then a statement is sufficient."  See Model

Jury Instructions on Homicide, supra.  We presume that the jury followed the judge's instructions.  See Commonwealth v. Bins, 465 Mass. 348, 367-368 (2013) (possible confusion from prosecutor's misstatement of law was remedied by judge's final charge).

f.  Instruction on viability.  In accordance with Commonwealth v. Crawford, 430 Mass. 683, 691 (2000), the judge instructed the jury that they were required to determine whether the fetus was viable as part of their determination whether the fetus had been murdered.  The judge explained that "[a] killing is not murder unless a human being has been killed.  A viable fetus is a human being under the law of homicide.  A fetus is viable when there is a reasonable likelihood of the fetus's sustained survival outside the womb, with or without artificial support."

The defendant recognizes that this instruction "apparently has the imprimatur of this [c]ourt."  He argues, however, that the instruction that this court accepted in Crawford is constitutionally flawed, because the third sentence would allow a jury to find that a fetus was a human being if there were merely a "reasonable likelihood" of sustained survival outside the womb.  In the defendant's view, the instruction "dilute[s]" the Commonwealth's burden to prove beyond a reasonable doubt that the fetus was viable.

Although the defendant did not object to the judge's instruction at trial, he argues that it resulted in structural error requiring reversal without a showing of actual harm. "[T]here is a very limited class of cases presenting structural errors that require automatic reversal absent waiver. Such errors include the denial of counsel or the right to public trial, the omission of an instruction on the standard of beyond a reasonable doubt, racial discrimination in the selection of a jury, or trial before a biased judge. These errors contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" (quotations and citations omitted). Commonwealth v. Francis, 485 Mass. 86, 99-100 (2020), cert. denied, 141 S. Ct. 2762 (2021). An error in defining an element of the crime, as the defendant alleges in this case, is not among the very limited class of structural errors requiring automatic reversal. See Commonwealth v. McCray, 93 Mass. App. Ct. 835, 845 (2018) (omission of element of crime from judge's charge did not constitute structural error and was subject to harmless error analysis). See also Neder v. United States, 527 U.S. 1, 8 (1999) ("jury instruction that omits an element of the offense . . . differs markedly from the constitutional violations we have found to defy harmless-error review"). We therefore review the defendant's argument for a substantial

likelihood of a miscarriage of justice.  See <u>Wright</u>, 411 Mass. at 681.

Because Galperina was approximately one week away from her delivery date, and the fetus was full term, there was no substantial likelihood of a miscarriage of justice in the purported diminution of the Commonwealth's burden to prove that the fetus was viable.[5]  Given the facts of this case, and as the language used in <u>Crawford</u> is no longer included in the Model Jury Instructions on Homicide, there is no need to consider the question whether the "reasonable likelihood" portion of the <u>Crawford</u> instruction on viability relates to a preliminary question of fact that need not be proved beyond a reasonable doubt.

g.  <u>Discharge of deliberating juror</u>.  On the second full day of deliberations, the judge received a note from the foreperson reading, "We are concerned that one juror is not able

---

[5] The defendant also contends that the judge, sua sponte, should have provided the jury with an involuntary manslaughter instruction, and that the failure to do so created a substantial likelihood of a miscarriage of justice.  The instruction, he argues, was based on the "entirely plausible -- indeed likely -- [proposition] that [he] was not even thinking of the fetus when he stabbed Galperina."  We conclude that the judge was not required to instruct on this lesser included offense where no rational view of the evidence established that the defendant "was not even thinking about the fetus."  This theory would have been farfetched given the defendant's position at trial that he "lost it" in light of evidence introduced at trial centered around Galperina's pregnancy and the defendant's expected relationship with his unborn son named "David."

to productively contribute to deliberations."  The judge questioned the foreperson with the caveat that the foreperson not reveal "anything about [the jury's] deliberations."  The foreperson reported that juror no. 12 "[s]everal times . . . refused to participate" in deliberations and seemed mentally unstable.  The foreperson also stated that this was "not related to the case."

Where reliable information comes to a judge suggesting a lack of impartiality, bias, extraneous influence, or inability to deliberate on the part of one of the jurors, a judge should conduct a voir dire of the juror.  See, e.g., Commonwealth v. Robinson, 482 Mass. 741, 748 (2019) (possible extraneous influence and prejudice); Commonwealth v. Colon, 482 Mass. 162, 182-183 (2019) (question of lack of impartiality due to racial or ethnic bias); Commonwealth v. Villalobos, 478 Mass. 1007, 1007-1009 (2017) (possibly inattentive or sleeping juror); Commonwealth v. McGhee, 470 Mass. 638, 643-646 (2015) (same).

Here, the judge determined, based on the note, that he had enough information to inquire of juror no. 12 due to her alleged refusal to deliberate.  The judge began the voir dire by informing the juror, "[W]hen you answer the questions, as difficult as it is, I can't have you tell me anything about the content about the deliberation . . . .  In other words, don't talk to me about anything that you have talked about with your

fellow jurors during jury deliberations." The juror responded, "I understand what the constraint is." She explained that it had been a "difficult day" and that there were "a lot of emotions around," but that she had been able to participate in the discussions. The judge invited both sides to suggest further questions, and they each indicated that they were satisfied with the inquiry. The judge ruled that, at that point, he did not have adequate grounds to discharge the deliberating juror. Defense counsel then noted that he was concerned that juror no. 12 "basically grabbed a point of view and [was] sticking to it" and had "not mentally even explored her position or anyone else's." Counsel added that the defendant was "content to have her removed."

The judge decided to ask juror no. 12 additional questions about her ability to deliberate. She answered that she could participate fully in deliberations. She indicated that she felt "singled out" because she had "a difference of opinion in weighing of evidence." Based on his observations of the juror, the judge made clear that the juror's angry and unstable demeanor would not be apparent from the trial transcripts. Defense counsel agreed; he commented that juror no. 12 was "immediately strident" and "angry" and appeared to be incapable of following the judge's instruction to keep an open mind.

Counsel also asserted that the voir dire hearings had made juror no. 12 "more damaged."

The judge indicated that he would consider an agreement to discharge the juror. He added, "If there was an objection from either party, . . . I probably wouldn't excuse [juror no. 12]." Defense counsel stated that juror no. 12 should be discharged and that he would object if the juror were to remain on the jury. The judge then conducted a colloquy with the defendant. The defendant said that he had had an adequate opportunity to consult with counsel on the issue, and that he was acting on the advice of counsel and agreed to defer to counsel's judgment. The judge discharged juror no. 12.

The defendant now argues that it was error to discharge the deliberating juror without following the requirements set forth in Commonwealth v. Connor, 392 Mass. 838, 843-846 (1984). In particular, the defendant points out, the juror was not informed that she could not be discharged unless she had a personal problem unrelated to her relationship with other jurors or their views of the case. The defendant maintains that this error created a substantial likelihood of a miscarriage of justice.

"The discharge of a deliberating juror is a sensitive undertaking and is fraught with potential for error. It is to be done only in special circumstances, and with special precautions. Great care must be taken to ensure that a lone

dissenting juror is not permitted to evade his responsibilities." Connor, 392 Mass. at 843. A judge is required to hold a hearing "to determine whether there is good cause to discharge a juror." Id. at 844. "At the hearing, the issues of the case and the juror's relationship to his [or her] fellow jurors are not to be discussed. . . . If the 'problem' juror is questioned, the judge should preliminarily inform [the juror] that [the juror] cannot be discharged unless [the juror] has a personal problem, unrelated to his [or her] relationship to his [or her] fellow jurors or his [or her] views on the case." Id. at 845.

We agree with the defendant's argument that the judge failed strictly to adhere to our holding in Connor, 392 Mass. at 843-846. The judge took "utmost caution . . . to avoid invading the province of the jury," see id. at 844, by instructing juror no. 12 not to discuss the content of the jury's deliberations. He did not, however, preliminarily notify juror no. 12 that she could not "be discharged unless [she] has a personal problem, unrelated to [her] relationship to [other] jurors or [her] views on the case." Id. at 845. See Commonwealth v. Williams, 486 Mass. 646, 656 (2021).

Having determined that the judge did not provide juror no. 12 an adequate preliminary warning, we consider whether this error created a substantial likelihood of a miscarriage of

justice. "General Laws c. 234A, § 74, provides that any 'irregularity' with respect to discharging or managing jurors will not lead to vacatur unless the error is preserved by objection and the 'objecting party has been specially injured or prejudiced thereby.'" Williams, 486 Mass. at 657. See Swafford, 441 Mass. at 336 ("While we have established guidelines that trial judges must follow when discharging a deliberating juror," verdict is not set aside unless objecting party is prejudiced); Commonwealth v. Garrey, 436 Mass. 422, 431 (2002) (verdict shall not be set aside based on irregularity in discharging deliberating juror absent objection and prejudice).

Here, defense counsel requested the discharge of juror no. 12 and objected to her remaining on the jury. The defendant has not pointed to any prejudice, however, from the assented-to discharge of juror no. 12 beyond speculation that "she was a dissenting or hold-out juror, leaning towards a manslaughter verdict." See Commonwealth v. Tiscione, 482 Mass. 485, 493 (2019) (discharge of juror had impact on case where jury appeared deadlocked). We therefore conclude that there was no substantial likelihood of a miscarriage of justice.

h. Relief pursuant to G. L. c. 278, § 33E. We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the degree of guilt.

<u>Judgments affirmed</u>.

CYPHER, J. (concurring).  I concur with the court's opinion completely.  I write separately to call attention to the fact that women in the United States are more likely to be killed by homicide during pregnancy or soon after childbirth than to die from the three leading obstetric causes of maternal mortality (hypertensive disorders, hemorrhage, or sepsis).  Lawn & Koenen, Homicide Is a Leading Cause of Death for Pregnant Women in US, BMJ 2022;379:o2499 (Oct. 19, 2022).  "Homicide during pregnancy or within [forty-two] days of the end of pregnancy exceeded all the leading causes of maternal mortality by more than twofold." Wallace, Gillispie-Bell, Cruz, Davis, & Vilda, Homicide During Pregnancy and the Postpartum Period in the United States, 2018-2019, Obstetrics & Gynecology, vol. 138, no. 5, Nov. 1, 2021, at 762-769, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9134264 [https://perma.cc/D7Q4-YZV2].

It is important to emphasize that the brutal facts of this case are not an anomaly.  The disconcerting frequency of lethal violence against pregnant women warrants concomitant response from our justice system.  This court's acknowledgement that oral revelations, on their own, cannot induce a reasonable person to kill their pregnant partner is a laudable first step.  See ante at    .  I would take it one step further and reject the principle that discovery of infidelity, whether oral or through personal observation, can amount to adequate provocation to kill

a partner, standing alone.  Compare Commonwealth v. Steeves, 490
Mass. 270, 292 n.12 (2022) (expressing "serious doubt about the
ongoing viability of [the] legal principle [that sudden
revelation of infidelity may be adequate provocation]"),
Commonwealth v. Paige, 488 Mass. 677, 686-687 (2021) (Cypher,
J., concurring) (allowing discovery of infidelity as adequate
provocation "implies that the victim, by committing adultery, is
partly to blame for the defendant's violence . . . .  Where the
law treats homicide as a reasonable reaction to infidelity, it
condones femicide"), and Commonwealth v. Richards, 485 Mass.
896, 922-923 (2020) (Cypher, J., concurring) ("it is time to
retire the legal principle that spousal infidelity, even if it
is a sudden discovery, entitles a defendant to an instruction on
reasonable provocation for murder"), with Commonwealth v.
LeClair, 429 Mass. 313, 317 (1999) ("A sudden oral revelation of
infidelity may be sufficient provocation to reduce murder to
manslaughter").