COMMONWEALTH *vs.* DWAYNE TAYLOR.

Middlesex. September 7, 2012. - December 12, 2012.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Substitution of judge, Assistance of counsel, Argument by counsel, Presumptions and burden of proof. *Intent. Evidence,* Intent, Presumptions and burden of proof. *Constitutional Law,* Assistance of counsel, Burden of proof.

At a murder trial, the judge did not err in providing, in response to a question from the jury, a supplemental instruction on transferred intent regarding the element of premeditation, where there was no risk that the jury concluded that the defendant premeditated the killing of someone other than the actual victim or a member of a group of persons that did not include the actual victim, and transferred that premeditation to the killing of the actual victim [861-866]; further, the judge did not err in failing specifically to remind the jury that deliberate premeditation required a decision to kill, not merely to shoot, where there was no significant risk that the jury understood from the judge's earlier instructions and the supplemental instruction that a decision to shoot, but not to kill, was sufficient to satisfy the element of deliberate premeditation [866-867].

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the provision of a supplemental jury instruction by a judge other than the trial judge in circumstances in which the trial judge was neither sick nor disabled and in which the substitute judge did not certify in writing that he had familiarized himself with the record of the trial. [867-868]

There was no merit to a criminal defendant's argument that his trial counsel, in opening statement, rendered ineffective assistance either by assuming the burden of proving the defendant innocent or by alluding to evidence that he later failed to produce [868-869]; moreover, this court concluded that even if counsel's conduct fell measurably below that which might be expected from an ordinary fallible lawyer, counsel's performance did not create a substantial likelihood of a miscarriage of justice [869-870].

INDICTMENTS found and returned in the Superior Court Department on June 3, 2004.

The cases were tried before *Isaac Borenstein,* J.

*Linda J. Thompson (Robert Hennessy* with her) for the defendant.

*Stephen C. Hoctor,* Assistant District Attorney, for the Commonwealth.

GANTS, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation, in violation of G. L. c. 265, § 1, for the killing of David Fleet.[1] The defendant raises four issues on appeal. First, he argues that the judge, in response to a question from the jury, erred in instructing the jury that "[t]o prove premeditation the Commonwealth must prove beyond a reasonable doubt that the defendant planned and intended to kill someone," and that it is "immaterial" whether the intended victim was the actual victim. Second, he contends that it was improper under Mass. R. Crim. P. 38 (a), 378 Mass. 916 (1979), for a judge other than the trial judge to provide the jury with this supplemental instruction where the trial judge was not sick or disabled, and where the substitute judge did not certify that he was familiar with the record of the trial. Third, the defendant maintains that he was denied effective assistance of counsel because in his opening statement defense counsel promised the jury that he would "prove" that the defendant did not shoot the victim and that the clothing worn by the shooter was commonly worn by African-American males. Fourth, he claims that, in light of the evidence, a conviction of voluntary manslaughter would be more consonant with justice under G. L. c. 278, § 33E. For the reasons detailed below, we affirm the convictions and, after a complete review of the record, decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt.

*Background.* The defendant does not challenge the sufficiency of the evidence at trial. We summarize the key evidence supporting the jury's guilty verdicts.

The victim, who was twenty-three years of age when he died, lived with two friends in a house in Natick. On the evening of May 7, 2004, a number of their friends who worked in local restaurants came to the house for an informal party. Two of the guests, Patrick Nadeau and Jeffrey Kline, unsuccessfully tried

---

[1]The defendant also was convicted of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*). He was sentenced to life in prison without the possibility of parole on the murder conviction, and to from four to five years in State prison on the firearm conviction, to be served concurrently with his life sentence.

to buy some cocaine to bring to the party. When Nadeau and Kline arrived at the party, they asked another guest if she could help them. She telephoned Kevin Toland (Toland) and asked him if he knew anyone who had cocaine to sell that evening. She met Toland at approximately 10:30 P.M. at a convenience store across the street from the victim's home, and returned to the party with him. The other men who accompanied Toland included his brother, Jason; Kenneth Horne; and the defendant (the uninvited guests). One of them, not the defendant, sold cocaine to Kline, who proceeded to share it with Nadeau and others at the party, including the victim, but not the defendant.

None of the invited guests at the party knew the defendant, who was the only African-American at the party. The defendant wore distinctive garb: a dark T-shirt, dark green camouflage pants, and a camouflage hat. At approximately 1 A.M., after the victim had been told that one of the uninvited guests was trying to steal some items, the victim told the defendant that the defendant's friends were trying to steal from the victim and that the defendant could stay but they had to leave. A scuffle broke out between the defendant and the victim, and Nadeau intervened and pulled them apart. The uninvited guests were about to leave when the defendant said that he wanted his hat, which had fallen off in the scuffle. When Nadeau retrieved the defendant's hat for him, the defendant punched Nadeau in the forehead, and a fist fight followed. The victim and his friends forced the defendant to the ground and told him he had to go. They then allowed him to stand up, and the uninvited guests left.

Horne, driving a blue Geo Tracker vehicle, dropped the Tolands off at their home; the defendant remained in the vehicle. After they left, Chad Rudolph, one of the victim's roommates, discovered that fifty dollars in cash was missing from his desk drawer.

At approximately 1:30 A.M., Horne returned to the party and said that he was angry because he had been punched by someone during the fight.[2] The defendant also returned, but stood on the rear porch of the house. Rudolph, speaking from the window of

---

[2]At approximately 1:24 A.M., a surveillance camera at the convenience store across the street from the victim's house captured Kenneth Horne making a purchase; the defendant was not seen on the videotape.

his upstairs room, asked the defendant why he had returned and said that he wanted his money back. The defendant pulled out a wad of cash and said it was "right here," but that Rudolph had to come down to get it from him. Rudolph told him to place the money on the deck and leave; Rudolph said he did not want any more problems.

Seventeen year old Stephen Kelly, who had arrived at the party after the fight, went outside to the porch to speak with the defendant. He knew the defendant, whom he called Sosa, because he had "business dealings" with him during the summer and fall of 2003, and saw him every day during that period. The defendant told Kelly about the fight and how he had been kicked out of the house. Kelly urged him to leave and not retaliate. The defendant replied that he was there to get what "he had to do done," and that he was going to shoot the victim.[3] Kelly pleaded with him, telling him that he was in Natick and would be caught quickly, and that it was not worth it. The defendant responded that he did not care, and warned Kelly to get out of his way or he could end up like the other person. Kelly walked to the rear glass door on the porch and opened it. When he did so, the defendant "rush[ed] the door" and tried to force his way inside. The victim and his friend, Mark Manzella, who were inside the house by the rear glass door, shut the door on the defendant's outstretched arm, and the defendant pulled his arm away. They succeeded in pushing the door shut and either locked it or were attempting to lock it when the defendant pulled a gun from his waist, aimed the gun at the victim, and fired a single shot, shattering the glass on the door and striking the victim in the heart. The victim was transported to a hospital, where he was pronounced dead.

At approximately 2:50 A.M. that morning, Framingham police Officer Brian Langelier spotted a blue Geo Tracker vehicle, which he soon learned was registered to Horne. He stopped the vehicle and ordered the driver, who was Horne, and the front seat passenger, who was the defendant, to leave the vehicle, which they did, leaving the front doors to the vehicle open.

---

[3]Stephen Kelly initially testified that the defendant said "[t]hat he was going to shoot Dave," but when asked if the defendant used the victim's name, he replied, "No, not that I recall."

Framingham police Sergeant Patricia Grigas looked inside the vehicle to ensure that there was no other passenger in the rear seat, and saw a firearm on the floor of the front passenger seat.[4] Massachusetts State police Sergeant David Cahill, a ballistics expert in the firearms identification section of the State crime laboratory, compared the projectile taken from the victim's body during the autopsy with projectiles from test firings of the firearm found in Horne's vehicle, a nine millimeter Helwan semiautomatic pistol, and opined that the pistol had fired the shot that killed the victim.

The defendant was arrested, booked, and given the Miranda warnings. He agreed to speak with Natick police Detective John W. Doherty, Jr., but declined to have his statement tape recorded. The defendant said that the firearm belonged to Horne, not to him, and denied that he shot anyone. When asked about his whereabouts that evening, he said that he left his apartment in Marlborough at 8 P.M. and was driven by a friend to "Samantha's" house on Irvington Street in Framingham.[5] After spending an hour with her, he saw Horne in his vehicle and "flagged him down." They drove into the Roxbury section of Boston "looking for girls" at 10 or 11 P.M. Horne was driving him home to Marlborough when the police stopped him. He did not recall being in Natick that evening, but noted that he did not know the towns in the area. The defendant said that he had drunk two beers that evening and did not use drugs.

*Discussion.* 1. *Supplemental jury instruction on premeditation.* After the judge provided the jury with his final instructions of law, he informed them that he would not be in court during their deliberations, that another Superior Court judge would

---

[4]The defendant moved to suppress the firearm, claiming that it arose from an unlawful stop of the vehicle. The motion judge (who was not the trial judge) denied the motion, finding that the officer had probable cause to stop the vehicle. On appeal, the defendant does not challenge the denial of the motion to suppress. Nonetheless, as part of our plenary review under G. L. c. 278, § 33E, we have reviewed the transcript of the motion hearing and conclude that the motion was properly denied.

[5]Later in the interview, the defendant said that he received a telephone call from Samantha at 10 P.M. and an hour later his friend, Marco, drove him to Samantha's house. He was unable to provide Samantha's last name or telephone number; nor could he provide a last name for Marco. There is no Irvington Street in Framingham, but there is an Irving Street in the town.

address any questions the jury may have as to the law, and that he would be available by telephone to confer with that judge.[6] During the morning of their second day of deliberations, the jury sent a note that read, "To meet the criteria of premeditation, would the defendant have to plan to kill David Fleet specifically or to shoot someone?" The prosecutor proposed that the judge instruct the jury that "he needs to intend to shoot somebody and particularly the person he points the gun at." The defendant suggested that the defendant did not have to know the name of the victim, but "he has to have focused on a particular individual and to have shot at that individual, intending to kill him after some cool reflection on the decision to kill."

The substitute judge informed the jury that their question "require[d] the attention of [the trial judge]," and instructed them not to continue to deliberate that day. The next morning, the substitute judge conducted a telephone conference with the trial judge, attended by the prosecutor, the defendant, and defense counsel, where the prosecutor and defense counsel, through the telephone's "speaker" option, directly addressed the trial judge.[7] The substitute judge read a proposed jury instruction he had drafted, which was revised after consultation with counsel and approved, as revised, by the trial judge. The substitute judge then read to the jury the instruction that the trial judge had approved:

> "To prove premeditation the Commonwealth must prove beyond a reasonable doubt that the defendant planned and intended to kill someone. If the Commonwealth proves that the defendant did intend to kill someone with deliberate premeditation, the fact that he may have killed someone other than that person is immaterial. The Commonwealth does not have to prove the identity of the intended victim."

The defendant objected to the trial judge's ruling of law, but not

[6]The record reflects that the judge said that he would be away for one week on a long-scheduled commitment. There is nothing in the record to suggest that his absence was due to sickness or disability.

[7]The defendant agreed to this procedure. The substitute judge offered to telephone the trial judge from the court room, but noted that the court room telephone did not have an external speaker. The defendant asked that the conference call be conducted in the judge's lobby.

to the language in the instruction fashioned in light of that ruling.

The defendant argues that the supplemental instruction constituted reversible error because it was premised on a theory of transferred intent where there was insufficient evidence of transferred intent to warrant such an instruction. The defendant also argues that the instruction was fatally flawed because it failed adequately to explain the law of transferred intent, and failed to correct the jury's apparent misconception that an intent to shoot necessarily implied an intent to kill.

A transferred intent instruction provides that if a defendant intends to kill a person and in attempting to do so mistakenly kills another person, such as a bystander, the defendant is treated under the law as if he intended to kill the bystander. See, e.g., *Commonwealth* v. *Shea*, 460 Mass. 163, 172-174 & n.7 (2011); *Commonwealth* v. *Pitts*, 403 Mass. 665, 669 & n.6 (1989). The same principle of transferred intent applies to the element of premeditation: where a defendant decides after deliberation to kill one person and mistakenly kills another, the defendant's premeditation is transferred to the actual, unintended victim. See *Commonwealth* v. *Diaz*, 431 Mass. 822, 831-832 (2000) (defendant guilty of premeditated murder under doctrine of transferred intent where he planned to kill former girl friend but mistakenly killed her sister); *Commonwealth* v. *Santiago*, 425 Mass. 491, 502 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998) (premeditated intent to kill man on sidewalk may be transferred to actual victim).

A transferred intent instruction is appropriate regarding the element of deliberate premeditation where there is sufficient evidence for a jury to find beyond a reasonable doubt that the defendant decided after deliberation to kill one person but, in attempting to do so, killed another person that he may not have planned to kill. See *Commonwealth* v. *Pitts*, *supra* at 669. A comparable but slightly different instruction is appropriate regarding the element of deliberate premeditation where there is sufficient evidence that the defendant decided after deliberation to kill someone within a group and, in attempting to do so, killed a member of that group. Cf. *Commonwealth* v. *Reaves*, 434 Mass. 383, 390-391 (2001) (deliberate premeditation where

defendant carried out plan to shoot at group of persons who had stolen his money and killed one of them); *Commonwealth* v. *Chipman*, 418 Mass. 262, 269-270 (1994) (deliberate premeditation where defendant carried out plan to shoot at vehicles on highway and killed child in school bus). In such cases, it is appropriate to instruct the jury that they may find deliberate premeditation if they find that the defendant deliberately decided to kill someone in the group, regardless of whether the defendant intended to kill the actual victim who was among the target group. For instance, if a defendant decides to shoot a member of a rival gang and proceeds to shoot at a group of rival gang members, a jury may find deliberate premeditation even if the defendant did not specifically intend to kill the particular rival gang member who was killed. See, e.g., *Commonwealth* v. *Walker*, 460 Mass. 590, 592-593 (2011); *Commonwealth* v. *Jiles*, 428 Mass. 66, 70-73 (1998).

Here, a reasonable jury may have concluded from the evidence that, when the defendant returned to the house and stood on the porch, he decided to kill the victim, but they also reasonably may have concluded that he decided to kill anyone in the house who participated in the fight, and simply happened to shoot the victim because he was standing on the other side of the glass door trying to prevent the defendant from entering. When the judge initially instructed the jury as to the element of deliberate premeditation, he told them, "The Commonwealth must prove that the defendant actually intended to cause the death of David Fleet in order for the defendant to be found guilty of first degree murder by deliberate premeditation." The jury's question suggests that they sought guidance as to whether, in order to find deliberate premeditation, they needed to find that the defendant specifically planned to kill the actual victim or whether it was sufficient for them to find that he planned to kill someone inside the house.[8] The supplemental instruction, viewed in the context of the case, essentially informed the jury that they could find that the defendant deliberately premeditated the killing if they found that he planned to kill someone who was inside the house, even if they failed to find that he specifically planned to

---

[8]The trial judge provided the jury with a tape recording of his instructions of law and gave each juror a written copy of the jury instructions.

kill the actual victim. See *Commonwealth* v. *Stewart*, 460 Mass. 817, 824 (2011), quoting *Commonwealth* v. *Waite*, 422 Mass. 792, 804 (1996) ("We 'evaluate the charge as a whole, looking for what meaning a reasonable juror could put to the words of the trial judge' "). We conclude that, in the circumstances of this case, the instruction was not error.

We understand that there could be circumstances where such an instruction, unless more carefully delineated, may constitute reversible error. For instance, in *State* v. *Batson*, 339 Mo. 298, 300 (1936), the defendant accused a justice of the peace of having forged the defendant's signature on a document and shot the justice at point-blank range. When a deputy constable charged toward the defendant, the defendant fired at him, but missed and struck a dentist who was standing beside the constable, killing the dentist. *Id.* The trial judge instructed the jury that, if they found that the defendant "willfully, deliberately, premeditatedly, and with malice aforethought" attempted to shoot the justice and in the attempt shot and killed the dentist, then any such wilfulness, deliberation, premeditation, and malice must be attributed to the defendant in the killing of the dentist. *Id.* at 303. The Supreme Court of Missouri reversed the defendant's conviction of murder for the killing of the dentist, concluding that the instruction was prejudicial where it told the jury that they could find the defendant guilty of murder in the first degree for the killing of the dentist if they found he was attempting to murder the justice, when all the evidence showed that he was shooting at the constable, not the justice, when he shot the dentist. *Id.* at 307.

Similarly, in *State* v. *Hall*, 722 N.W.2d 472, 475 (Minn. 2006), the defendant threatened a clerk at a gasoline station and then, after leaving the station, fought with unidentified men outside the station. He told his friends that he "got jumped" by three men, and said he was going to kill them. *Id.* He then left his apartment with a gun and shot the clerk (who was not involved in the earlier fight) at point-blank range. *Id.* The judge instructed the jury, "If the [d]efendant acted with premeditation and with the intent to cause the death of another, the element of premeditation and intent to kill is satisfied, even though the [d]efendant did not intend to kill [the actual victim]." *Id.* at 476. The

Supreme Court of Minnesota held that the facts of the case did not justify a transferred intent instruction because there was no evidence that the actual victim was an unintended victim or that, when the defendant shot the actual victim, he intended to kill anyone other than the actual victim. *Id.* at 478. See *State* v. *Cruz-Ramirez*, 771 N.W.2d 497, 507 (2009). The court found that the error was not harmless because the jury may have concluded that the defendant premeditated the murder of the men with whom he fought, and transferred that intent to the killing of the actual victim. *State* v. *Hall*, *supra* at 479.

The circumstances that caused reversal in those cases are not present in this case. Here, there was no evidence that the defendant premeditated the killing of anyone other than the actual victim or a group of persons that included the actual victim. If the jury found that the defendant deliberately premeditated someone's murder before returning to the victim's house or while standing on the porch outside the victim's house, they reasonably could have found either that he decided to kill the actual victim, as suggested by Kelly's testimony, or that he decided to kill someone inside the house who participated in the earlier fight (a group that included the actual victim). If they found that he did not decide to kill until he was barred from entering the house, then they reasonably could have found that he decided to kill the actual victim, because he would have been able to see the actual victim through the window of the porch door before he shot him at close range. In short, there was no risk here that the jury concluded that the defendant premeditated the killing of someone other than the actual victim or a member of a group of persons that did not include the actual victim, and transferred that premeditation to the killing of the actual victim.

Nor did the trial judge err in failing specifically to remind the jury that, despite the wording of their question, deliberate premeditation required a decision to kill, not merely to shoot. The supplemental instruction clearly informed the jury that "[t]o prove premeditation, the Commonwealth must prove beyond a reasonable doubt that the defendant planned and intended to kill someone." There is no significant risk that the jury understood from the judge's earlier instructions and the

supplemental instruction that a decision to shoot, but not to kill, was sufficient to satisfy the element of deliberate premeditation.

2. *Alleged violation of Mass. R. Crim. P. 38 (a).* The defendant claims that it was a violation of rule 38 (a) for a judge other than the trial judge to provide the jury with a supplemental instruction where the trial judge was neither sick nor disabled, and where the substitute judge did not certify in writing that he had familiarized himself with the record of the trial.

Rule 38 (a) provides:

"If by reason of death, sickness, or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge of that court or properly assigned to that court, upon certifying in writing that he has familiarized himself with the record of the trial, may proceed with and finish the trial."

Here, there is no evidence in the record that the trial judge was sick or disabled, and the substitute judge did not certify in writing that he had familiarized himself with the record of the trial. However, the trial judge presided over the trial in person until the jury began their deliberations, and the only matter of substance addressed by the substitute judge was the question posed by the jury. The trial judge participated in a telephone conference attended by the substitute judge, counsel, and the defendant to frame an answer to the question, and the instruction provided in answer to the jury's question was approved by the trial judge during that conference.[9]

We need not reach the issue whether the substitute judge in these circumstances "proceed[ed] with and finish[ed] the trial" in violation of rule 38 (a) because the defendant did not object to the substitution, and we conclude that, even if there were a violation, no substantial likelihood of a miscarriage of justice arose from the violation. See *Commonwealth* v. *Trapp*, 396 Mass. 202, 213-214 (1985), *S.C.*, 423 Mass. 356, cert. denied,

---

[9]We recognize that the substitute judge initially drafted the proposed instruction, but conclude that this is immaterial where, as here, the instruction was revised during a telephone conference with the trial judge, defendant, and counsel, and the final instruction was specifically approved by the trial judge.

519 U.S. 1045 (1996).[10] See also *United States* v. *Lane,* 708 F.2d 1394, 1396-1398 (9th Cir. 1983) (finding no prejudice to defendant from violation of Fed. R. Crim. P. 25[a], Federal counterpart to rule 38 [a], where substitute judge, at direction of trial judge, provided proper instruction in answer to jury's question).[11]

3. *Ineffective assistance of counsel.* The defendant claims that he was denied effective assistance of counsel because his attorney in opening statement promised the jury that he would "prove" that the defendant did not shoot the victim and that the camouflage clothing worn by the shooter was commonly worn by African-American males. The defendant argues that, by offering to "prove" these assertions, his attorney assumed the burden of proving the defendant innocent, which was irreconcilable with his constitutional right to the presumption of innocence. See *People* v. *Dean,* 50 A.D.3d 1052, 1053 (N.Y. 2008). He also argues that it was particularly egregious to promise to prove that the defendant was not the shooter where he was the only African-American at the party, he wore camouflage pants at the party and when he was arrested, and nine witnesses who were at the party identified him in a photographic array. Moreover, he notes that, despite his promise of proof, his attorney offered no evidence to show that camouflage clothing was commonly worn by African-American males.

---

[10]In *Commonwealth* v. *Trapp,* 396 Mass. 202, 214 (1985), *S.C.,* 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996), we declared, "We need not decide whether such a substitution is reversible error because the defendant did not object to the substitution of judges at the time, nor did he claim dissatisfaction with the answers given to the jury by the first substitute judge." Here, the defendant objected to the instruction provided by the substitute judge to the supplemental question, but unlike in the *Trapp* case, where the substitute judge alone answered the jury's questions, the instruction was approved by the trial judge during a telephone conference attended by counsel and the defendant.

[11]Under Mass. R. Crim. P. 38 (b), 378 Mass. 916 (1978), "Any judge of a court or any judge properly assigned to that court may receive a verdict of the jury." We shall ask the standing advisory committee on the rules of criminal procedure to consider whether rule 38 (a) should be amended expressly to permit a judge to substitute for a trial judge who is unable to be physically present in court for reasons other than death, sickness, or other disability after a jury begin their deliberations, where the trial judge is available to confer with the substitute judge, counsel, and all defendants by telephone on the record and, as here, approves any instruction provided in answer to a jury question.

We have rejected "any suggestion that trial counsel's failure to produce evidence to which counsel alludes in an opening statement constitutes, in and of itself, ineffective assistance of counsel in all cases." *Commonwealth* v. *Duran*, 435 Mass. 97, 109-110 (2001), and cases cited. We also recognize that a claim of ineffective assistance of counsel that has not first been made in a motion for a new trial is the "weakest form" of such a challenge because "it is bereft of any explanation by trial counsel for his actions." *Commonwealth* v. *Diaz*, 448 Mass. 286, 289 (2007), quoting *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002). See *Commonwealth* v. *Zinser*, 446 Mass. 807, 810-812 (2006).

We acknowledge that a defense attorney should be cautious in making promises to a jury in an opening statement that he may be unable to keep. We also recognize the danger that a defense counsel's offer to "prove" facts may be misunderstood by a jury as accepting a burden of proof that both our Federal and State Constitutions impose on the Commonwealth. But even if defense counsel failed to exercise appropriate caution in his opening statement, we conclude from the entirety of the trial record that the defendant was not denied the effective assistance of counsel. Rather, even though faced with overwhelming evidence — nine eyewitness identifications, the discovery of the firearm used in the shooting below the seat the defendant had occupied in Horne's vehicle, the defendant's statements to Kelly of his intention to retaliate, and his implausible alibi in his statement to police — defense counsel identified the flaws in the witness identifications, challenged the ballistics evidence, effectively cross-examined Kelly as to his credibility, and in closing argument marshaled the meager evidence suggesting that the defendant did not shoot the victim and that the killing was voluntary manslaughter, not murder. It is easy in hindsight for the defendant to question a defense strategy that attempted to challenge the identification evidence, but the record reflects that the defendant told the police after he was arrested that he did not commit the shooting, and there is nothing before us to suggest that the defendant was willing at trial to surrender any chance of a not guilty verdict and seek a verdict of voluntary manslaughter.

We also conclude that, even if counsel's conduct fell measur-

ably below that which might be expected from an ordinary, fallible lawyer, counsel's performance here did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). There was no significant possibility that, because of defense counsel's opening statement, the jury misunderstood who bore the burden of proof. The judge repeatedly, both before the opening statements and in his final instructions, instructed the jury that the burden of proving the defendant's guilt beyond a reasonable doubt rested with the Commonwealth. See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 (1998). In addition, the evidence that the defendant committed murder in the first degree was overwhelming. We are more than substantially confident that the jury verdict would have been the same even if the defense attorney had made none of the mistakes claimed on appeal. *Id.* at 292 n.3.

4. *Review under G. L. c. 278, § 33E.* The defendant claims under G. L. c. 278, § 33E, that, in light of the evidence, a conviction of voluntary manslaughter or murder in the second degree would be more consonant with justice. After careful review of the trial transcript, we disagree. The weight of the evidence does not support the defendant's contention that the killing occurred in a heat of passion arising from reasonable provocation. The defendant had left the victim's home in Horne's vehicle after the fight and chose to return to the victim's house with a firearm after the Toland brothers were dropped off at their home. There was ample time for him to have cooled off after the fight. Nor is it credible that the killing was triggered by pain the defendant suffered when the porch door closed on his arm as he tried to force his way into the victim's residence. Not only does the evidence strongly support the conclusion that the decision to kill was made before he "rush[ed] the door," but there was no sign of any bruises or cuts on the defendant's hands when he was booked following his arrest and little in the evidence to suggest that the defendant suffered greatly before he pulled his arm from the door. We conclude that the defendant received a fair trial, and that the interests of justice do not require the reduction of the murder conviction to a lesser degree of guilt or a new trial.

*Judgments affirmed.*