NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13131


COMMONWEALTH  vs.  ANGEL ACEVEDO.



Bristol.     March 10, 2023. – July 12, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Wendlandt, JJ.


Homicide.  Firearms.  Evidence, Third-party culprit, Prior
    misconduct.  Practice, Criminal, Capital case.



Indictments found and returned in the Superior Court
Department on April 5, 2016.

The cases were tried before Renee P. Dupuis, J.


Ira Alkalay for the defendant.
Mary Lee, Assistant District Attorney, for the
Commonwealth.


GAZIANO, J.  On December 31, 2016, Aaron Gant, Jr.

(victim), was fatally shot in the back of his head while sitting

in a sport utility vehicle (SUV) with three friends.  The

Commonwealth alleged that the defendant, Angel Acevedo, and the

codefendant, Aaron Bookman, committed the murder as part of a

long-standing feud between gangs associated with the West End

and South End sections of New Bedford.  In a joint trial, a Superior Court jury convicted the defendant and the codefendant of deliberately premeditated murder in the first degree and unlawful possession of a firearm.  See Commonwealth v. Bookman, 492 Mass.    (2023).

The defendant raises two issues in this direct appeal. First, he contends that the judge erred in excluding evidence that the occupants of the SUV were selling drugs on the night of the shooting and that knives were found inside and next to the vehicle.  He argues that this evidence supported a third-party culprit defense because the shooting victims were engaged in risky behavior and therefore may have been attacked by an unnamed rival drug dealer.  It also was admissible, he argues, to show that police failed to investigate a potential lead. Second, he contends that the judge abused her discretion by allowing evidence that the codefendant possessed a handgun eight months prior to the shooting.  Finally, the defendant asks this court to exercise its extraordinary authority pursuant to G. L. c. 278, § 33E, to grant him a new trial or to reduce the murder in the first degree conviction to a lesser degree of guilt. Having carefully examined the record and considered the defendant's arguments, we conclude that there is no error and find no reason to disturb the verdicts.

1. <u>Facts</u>. We summarize the facts that the jury could have found, reserving some details for later discussion of specific issues.

On December 31, 2015, at 7:18 <u>P</u>.<u>M</u>., the victim was shot to death on Pleasant Street in the South End section of New Bedford. He was seated in the rear driver's side seat of a maroon Mercedes SUV with three friends: Aaron Watkins (driver), Louis Class (front seat passenger), and Desmond Roderick (rear seat passenger).[1] The occupants of the SUV had grown up in the South End and were members of a gang associated with that section of the city. At the time of the shooting, the South End group actively was engaged in hostilities with individuals affiliated with the West End section of New Bedford. This long-standing rivalry had resulted in instances of gang-on-gang violence and corresponding retribution.

The defendant and his "cousin," the codefendant, were affiliated with the West End group. This was evidenced by the defendant's signature on a jail "security threat group affiliation form" acknowledging his gang membership since "[c]hildhood." The codefendant signed the same type of threat assessment form acknowledging affiliation with the West End

---

[1] Given that the spelling of certain names varies in the briefs, we use the names as they appear in the trial transcripts.

Potter Street neighborhood. The codefendant also had a Potter Street "P" tattooed on his face.

The Commonwealth introduced evidence of the defendant's motive to harm at least some of the occupants of the SUV.[2] He had fought Watkins in high school, and they did not get along as adults. On May 31, 2015, prior to the fatal shooting, the defendant had been shot in the leg while driving through the North End section of New Bedford. He refused to cooperate with law enforcement officers investigating the incident. Months later, on October 21, 2015, the defendant and his then girlfriend, Lorana Rivera, were ambushed in a drive-by shooting. He was shot in the face and had his jaw wired shut until late December 2015. The defendant told medical personnel that he knew who shot him but would not talk to police. Rivera, who was shot in the leg, identified South End group associate Rayshawn Lewis as the shooter. Rivera testified that she was unable to recall discussing the shooter's identity with the defendant.

The codefendant also had a history of problems with individuals affiliated with the South End gang. On June 27, 2014, he and his then girlfriend, Alicia Ryder, were inside her

_____

[2] Notwithstanding the defendant's affiliation with the West End group, he had a friendly relationship with the victim. The judge, at the Commonwealth's request, provided the jury with a transferred intent instruction. See Commonwealth v. Taylor, 463 Mass. 857, 863-864 (2012).

home when it was "shot up."  In or about the late spring of 2015, the victim and the victim's friends followed and watched the codefendant and Ryder at a restaurant and, once or twice, drove slowly by her house in an SUV.

Approximately one week before the fatal shooting, in late December 2015, the defendant asked his sister's boyfriend, Mason Soto, to rent a car for him.  Soto resided in Saco, Maine, having moved from New Bedford.  On December 24, 2015, Soto rented a 2016 white Ford Fusion from a car rental office in Westbrook, Maine, located near the Portland Airport.  The new model car was equipped with a sunroof and black wheel rims and had a Connecticut license plate.  Soto, the only authorized driver on the rental agreement, paid the rental fee in cash supplied by the defendant.  Later that evening, the defendant drove the Fusion from Saco to New Bedford, a 150-mile trip.

On December 31, 2015, the day of the shooting, the defendant and the codefendant telephoned or sent text messages to each other repeatedly throughout the day.  There was a gap in outgoing telephone calls and text messages for both the defendant and the codefendant around the time of the 7:18 P.M. shooting.  At 6:47 P.M., the defendant telephoned Rivera, and at 7:19 P.M., he telephoned an individual named Tyrone Mendes.  According to cell site location information records or cell

tower records, the 7:19 P.M. call registered to a cell tower about one-half mile away from the crime scene.

That afternoon, the defendant and Rivera had gone shopping at a mall in Taunton.  A mall parking lot security camera recorded the defendant behind the steering wheel of a white Ford Fusion at around 2 P.M.  Thereafter, the defendant drove the same vehicle to a New Bedford barbershop at 4:30 P.M., and left at 5:21 P.M.

The Commonwealth introduced additional security camera footage from numerous New Bedford locations depicting, with varying degrees of clarity, a white sedan resembling a Ford Fusion traveling throughout New Bedford in the early evening hours.  At 6:49 P.M., the defendant, wearing a red sweatshirt, and the codefendant, wearing a black sweatshirt, arrived at a liquor store on Nauset Street in New Bedford's North End.  They left the store minutes later, with the defendant driving and the codefendant in the passenger's seat.

At 6:56 P.M., another security camera captured images of the same or a similar white sedan pulling into the parking lot of a nearby liquor store on Mount Pleasant Street.  The defendant got out of the driver's side, and the codefendant got out of the passenger's side.  The defendant and the codefendant ran into two friends in the liquor store, and they exchanged greetings and small talk.  At 7 P.M., the defendant and the

codefendant left the store. Again, the defendant entered the driver's side of the white sedan, and the codefendant its passenger's side. The defendant drove out of the parking lot headed toward the South End section of the city.

A security camera mounted to a residence on Grinnell Street depicted a blurry image of an SUV, at around 7:15 P.M., turn onto Pleasant Street, near Louis Class's South End residence. A white sedan followed closely behind the SUV. A few minutes later, at 7:18 P.M., the New Bedford police received ShotSpotter acoustic alerts of multiple gunshots in the Pleasant Street area.[3] Neighbors reported hearing gunfire, but no one had witnessed the shooting.

Police responded within minutes of the alert and found evidence of a shooting near the intersection of Pleasant and Grinnell Streets. A gray sedan parked on Pleasant Street had a bullet hole near the trunk on the driver's side. There were no ejected shell casings found at the crime scene, suggesting that the rounds had been fired from a revolver.

At 7:20 P.M., the SUV arrived at a local hospital's emergency department. Watkins, Class, and Roderick got out of the SUV, seeking medical attention for their friend. The victim

---

[3] A "ShotSpotter" system "identifies firearm discharges by sound and directs officers to the general location of the shots." Commonwealth v. Evelyn, 485 Mass. 691, 694 (2020).

was unconscious and lifeless. He had been shot in the right side of the back of his head and died almost immediately from the gunshot wound. The medical examiner recovered a projectile from his body.

Police, dispatched to the hospital for a reported shooting, arrived at 7:24 P.M. The victim's friends were upset and did not cooperate with law enforcement officers. Other individuals affiliated with the South End group arrived at the hospital. One of them, Larry Pina, Jr., asked Watkins, "[W]ho was it, was it?" Watkins nodded his head, with his "chin [going] up and . . . down to [his] chest." Another, Ceasare Rodderick, appeared enraged and with a loud voice stated, "[W]hat are we waiting for, let's go."

At around 8:30 P.M., the defendant met Rivera in the parking lot of an elementary school in New Bedford where he had parked his vehicle (by inference, the Ford Fusion). At 8:47 P.M., Rivera, who was driving her mother's car, drove with the defendant to a supermarket to buy juice, leaving the Fusion behind. From the supermarket, they went to Rivera's mother's home for a New Year's Eve celebration, staying until the early morning hours. Driving in Rivera's mother's car, they then retrieved the Fusion from the school parking lot, returned Rivera's mother's car to her home, and drove the Fusion to a hotel in Seekonk, checking in at 3:29 A.M.

Later that morning, after checking out of the hotel, the defendant and Rivera traveled north to Maine to return the Fusion to the rental company. The defendant, with Soto's assistance, exchanged the Fusion for a Chevrolet Malibu. Rivera returned to New Bedford the following day. On January 3, 2016, Soto drove the defendant in the Malibu from Maine to the New Bedford police station, where the defendant was questioned by New Bedford detectives. The defendant stated that he was drunk on the night of the murder and that whatever his girlfriend told them in an earlier interview must be true.

Police officers and crime scene technicians searched the SUV. They observed three bullet holes in the rear of the vehicle -- one round struck the rear bumper and two rounds shattered the back window. Inside the SUV, the investigators recovered two projectiles, one in the rear deck and the other imbedded in the driver's side door.

A ballistician compared projectiles recovered from the SUV, the gray sedan parked on Pleasant Street, and the victim's body. All four projectiles were copper jacketed with consistent weights and had been fired from the barrel of a weapon with a right rifling twist and the same number of lands and grooves. Two of the projectiles, suitable for examination, were consistent with .38 caliber class ammunition. The ballistician opined that the same handgun fired the projectiles recovered

from the gray sedan and the victim's body.  He also testified that .38 caliber class ammunition most often is fired from revolvers.

On January 7, 2016, investigators tracked down the 2016 white Ford Fusion that was rented by Soto and used by the defendant.  After Soto returned the car, another customer rented it in Maine and dropped it off one week later at the rental agency branch near Bradley International Airport in Hartford, Connecticut.  A police officer who retrieved the Fusion from Connecticut observed a burn mark on the right passenger's side A-pillar, which was described as the "piece of metal in between the windshield and the [front] door[] that the roof connects to."  Forensic examiners obtained positive gunshot residue results from stubs collected from the Fusion's interior and front exterior passenger's side door window frame.

On January 19, 2016, detectives interviewed the codefendant at the New Bedford police headquarters.  Asked about his whereabouts on New Year's Eve, the codefendant stated that he was at his girlfriend's house from noon to 5 P.M.  The codefendant told the detectives that, between 6 and 6:30 P.M., the defendant picked him up on Myrtle Street and drove to liquor stores in the North End (depicted in video surveillance).  The defendant was driving a light-colored vehicle, which most likely was a rental car.  The codefendant told the detectives that the

defendant dropped him off at another cousin's house on Liberty Street at 6:30 or 7 P.M., and he stayed until ten minutes "after the ball dropped."  Other partygoers, however, recalled the codefendant arriving around 8 P.M.

2.  Prior proceedings.  A grand jury returned indictments charging the defendant and the codefendant with murder in the first degree (G. L. c. 265, § 1), unlawful possession of a firearm (G. L. c. 269, § 10 [a]), and assault and battery by means of a firearm (G. L. c. 265, § 15E).  The defendant filed a motion in limine to preclude the Commonwealth from "[r]eferring to [a]ny firearm that is not the firearm [a]lleged to have fired the fatal shots."  The Commonwealth filed a number of motions in limine, including motions to admit evidence of the codefendant's possession of a firearm before and after the murder, and to exclude third-party culprit evidence, evidence of drugs, and evidence of knives found in or near the SUV.  The defendant filed oppositions to the Commonwealth's motions to admit evidence of the codefendant's possession of firearms (prior to and after the murder), to restrict the defense of third-party culprit, and to exclude evidence of drugs.[4]

---

[4] Although the defendant included in his record appendix copies of oppositions to the Commonwealth's motions to exclude third-party culprit evidence and evidence of drugs, these oppositions, as well as each certificate of service, are not dated and do not appear on the docket as having been filed.

The trial judge allowed the Commonwealth to introduce evidence of only the codefendant's prior possession of a firearm.  She also allowed the Commonwealth's motions to exclude evidence of drugs, as well as drug dealing, and the presence of knives in or near the SUV.  "[B]y agreement," she allowed the Commonwealth's motion to exclude third-party culprit evidence.

Beginning on May 8, 2018, the defendant and the codefendant were tried before a Superior Court jury.  At the close of the evidence, the trial judge directed verdicts of not guilty for both the defendant and the codefendant on the charges of assault and battery by means of a firearm.  On June 6, 2018, the jury convicted the defendant and the codefendant of murder in the first degree on a theory of deliberate premeditation, and the jury also convicted them of unlawful possession of a firearm. The defendant received a life sentence without parole for the murder conviction and a concurrent lesser sentence for the unlawful possession of a firearm conviction.  He filed a timely appeal.

3.  Discussion.  The defendant argues that the judge erroneously excluded evidence that supported a third-party culprit defense and a Bowden defense of inadequate police investigation.  See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).  He also challenges the judge's admission of evidence that the codefendant possessed a firearm eight months

prior to the murder.  Finally, the defendant asks us to exercise our extraordinary authority under G. L. c. 278, § 33E, to order a new trial or to reduce the degree of guilt as to his conviction of murder in the first degree.  For the reasons discussed infra, we affirm the defendant's convictions and decline to exercise our authority under § 33E.

a.  Evidence of third-party culprit or inadequate police investigation.  Minutes after the shooting, police secured the SUV parked at the entrance to the hospital's emergency department.  The engine was running, and all four doors were wide open.  Inside the SUV, officers subsequently found a bag containing twenty-eight and one-half grams of marijuana on the floor of the rear passenger compartment.  They also found two folding knives, one located inside the SUV and the other on the ground a few feet from the rear passenger's side door where the SUV had been parked.  Both knives were closed in a folded position.  In addition, a crime scene investigator collected the victim's clothing at the hospital and discovered, inside a pants pocket, plastic baggies containing a substance, believed to be heroin, with a total weight of over ten grams.

The Commonwealth moved, in limine, to exclude evidence related to drug dealing, the drugs found in the SUV and the victim's clothing, and the two knives.  It argued that there was "no relevance, materiality or nexus" between this evidence and

the murder.  The Commonwealth also requested that the defendant, prior to introducing evidence of a potential third-party culprit, proffer to the judge the basis for such evidence and "'substantial connecting links' to the crime."

In response, the defendant filed an opposition[5] representing that "Aaron Watkins was a known drug dealer in New Bedford" who had been arrested for smuggling a large quantity of narcotics onto Martha's Vineyard in 2015.  The other occupants of the SUV were "similarly notorious."  The evidence was admissible, he argued, because "[t]he police are aware that [the occupants] have enemies.  Counsel must be able to explore such in order to provide a defense."  He argued, in the alternative, that evidence of drug dealing might be admissible to "set up a <u>Bowden</u> defense" if investigators failed to investigate the possibility that the victim was shot by unnamed enemy drug dealers.

Prior to jury selection, the judge conducted a hearing on the admissibility of the drugs and third-party culprit evidence. The defendant added that evidence of drug dealing was admissible to show that the occupants of the SUV "were leading a lifestyle that is not conducive to health," and that he should be permitted to ask the police officers and other witnesses "who these people [(the occupants of the SUV)] were."  This evidence,

---

[5] See note 4, <u>supra</u>.

he contended, countered the Commonwealth's theory that the murder was motivated by gang rivalry.  He did not press his alternative argument that any failure to explore third-party culprit evidence would cast doubt on the adequacy of the police investigation.

The judge allowed the Commonwealth's motions in limine to exclude evidence of drug dealing, and the drugs found in the SUV and the victim's clothing, without prejudice, "until such time the defendants establish that there's some relevance to this particular homicide."  The judge also allowed the Commonwealth's motion in limine to exclude third-party culprit evidence and evidence of the knives found inside and near the SUV.  Because the exclusion of third-party culprit evidence is an issue of constitutional dimension, we conduct a de novo review of the judge's decision.  Commonwealth v. Conkey, 443 Mass. 60, 66-67 (2004).

On appeal, the defendant contends that the judge erroneously thwarted his ability to "expose the role that New Bedford's drug trafficking trade may have played in the murder by introducing evidence that police officers found a large quantity of drugs in the victim's car."  The exclusion of this evidence, he argues, "deprived the defense of the plausible

alternative theory that rival drug dealers were responsible for the murder." We disagree.[6]

"Third-party culprit evidence is 'a time-honored method of defending against a criminal charge.'" Commonwealth v. Silva-Santiago, 453 Mass. 782, 800 (2009). A defendant, therefore, "may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it" (citation omitted). Commonwealth v. Smith, 461 Mass. 438, 445 (2012). See Mass. G. Evid. § 1105 (2023) ("Evidence that a third party committed the crimes charged

---

[6] For the first time on appeal, the defendant asserts that further "excluded" evidence demonstrated that the occupants of the SUV "had other adversaries in the city." This evidence, he argues, consisted of charges pending, at the time of trial, against Class (the front seat passenger), including a 2016 arrest for the murder of a West End group associate, Mateo Morales. This murder occurred approximately eight months after the victim's homicide. At trial, the defendant did not argue that the pending murder charge constituted evidence of another perpetrator. Instead, he contended that the evidence was admissible to demonstrate the bad character of the occupants of the SUV, so that the jurors "know . . . who these people were." The defendant having failed to raise the third-party culprit issue in the trial court, we limit our review to determining whether the exclusion of this evidence created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992). We conclude that it did not. The defendant did not provide the judge with an adequate offer of proof establishing that Class's pending criminal charges were evidence that "other adversaries" were responsible for the shooting. In addition, the Commonwealth contended that Class killed Morales in retaliation for the victim's murder. The pending charges, therefore, may have bolstered the Commonwealth's theory that the West End and South End gangs were engaged in cycles of retaliatory violence.

against the defendant, or had the motive, intent, and opportunity to commit the crimes, is admissible provided that the evidence . . . is relevant, is not too remote or speculative, and will not tend to prejudice or confuse the jury"). "We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. If the evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility" (quotations and citation omitted). Smith, supra.

The defendant's ability to mount a third-party culprit defense is not without limits. First, the proffered evidence "must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative" (citation omitted). Smith, 461 Mass. 445-446. See Commonwealth v. Andrade, 488 Mass. 522, 532 (2021) (introduction of third-party culprit evidence subject to ordinary considerations of relevance). Second, where the proffered evidence is hearsay, not subject to another exception, it is admissible only if it "is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other 'substantial connecting links' to the crime" (citation omitted). Silva-Santiago, 453 Mass. at 801. "Without these safeguards, 'the admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the

Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime.'"  Commonwealth v. Steadman, 489 Mass. 372, 383 (2022), quoting Silva-Santiago, supra.

We conclude that the judge properly excluded the proffered third-party culprit evidence consisting of drug dealing by the occupants of the SUV, and the drugs found in the SUV and the victim's clothing.  There was nothing more than rank speculation that the victim was shot by an unnamed rival drug dealer as a consequence of leading an unhealthy "lifestyle."  This court previously has considered and rejected the proposition that a victim's status as a drug dealer, standing alone, provides a ready-made third-party culprit defense.  See Commonwealth v. DePina, 476 Mass. 614, 630 (2017) (judge properly rejected as pure speculation theory that unknown rival drug dealers had motive to kill victim, in absence of any further evidence).  See also Andrade, 488 Mass. at 533 (third-party culprit defense based on possible rival gang members living in vicinity of shooting "was speculative at best"); Commonwealth v. Martinez, 487 Mass. 265, 268 & n.3 (2021) (evidence of purported third-party culprit's intent and motive to kill victim excluded as impermissibly speculative).  The defendant is unable to "escape

the consequences" of a vague third-party culprit proffer.
Smith, 461 Mass. at 447.

The judge also properly excluded evidence that knives, in folded positions, were found in and near the SUV.  Discussing the possible relevance of the knives, the judge observed that this is "an identification case" and "isn't a self-defense case."  Counsel for the codefendant conceded that the knives were not relevant, stating:  "There's no use [of the knives]. There's no flashing."  The defendant responded that the knives should be admitted in evidence because "if the car was searched, [the jury] . . . should . . . know what was in the car."  This argument was a far cry from using the presence of the knives in and around the SUV to point the finger of blame at another culprit.

We next address the defendant's claim that evidence of drug dealing was admissible as part of a Bowden defense.  Unlike the exclusion of third-party culprit evidence, the exclusion of Bowden evidence "is not constitutional in nature and therefore is examined under an abuse of discretion standard."  Silva-Santiago, 453 Mass. at 804 n.26.  "Before the introduction of such evidence, the judge should conduct a voir dire hearing to determine whether the third-party culprit information had been furnished to the police, and whether its probative value is

substantially outweighed by the danger of unfair prejudice"
(quotations and citations omitted).  Steadman, 489 Mass. at 385.

The defendant, in pretrial hearings, did not argue that
police unreasonably failed to investigate the possibility that
the victim had been attacked by rival drug dealers.  He also did
not object to the judge's ruling excluding the evidence on that
basis.  This raises the issue whether the defendant brought the
alleged impending error to the judge's attention so as to
provide the court with an opportunity to correct it.  See
Commonwealth v. McDonagh, 480 Mass. 131, 138 (2018) (discussing
adequacy of objection to preserve issue for appellate review).
Where the error is unpreserved, we review for a substantial
likelihood of a miscarriage of justice.  Commonwealth v. Wright,
411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

Here, we need not decide whether the defendant's claim of
error was preserved, because we conclude that there was no
error.  The defendant's rival drug dealer theory, which was "no
more than speculation and conjecture," did little to cast doubt
on the adequacy of the police investigation.  Martinez, 487
Mass. at 271.  "It therefore did not have 'sufficient indicia of
reliability'" to qualify as Bowden evidence (citation omitted).
Id.

b.  Prior possession of firearm.  The defendant's second
claim of error focuses on the judge's decision to allow the

introduction of testimony that the codefendant possessed a firearm eight months before the shooting.  The Commonwealth filed a motion in limine to permit the codefendant's former girlfriend to testify that, in the spring of 2015, while they were living in Florida, she observed a gun resembling a revolver tucked in the codefendant's waistband.  The absence of shell casings at the crime scene, the Commonwealth argued, suggested that a revolver was used.

The defendant sought to exclude the testimony as improper propensity evidence.  He argued that the codefendant's possession of a firearm "has no probative value and the potential for unfair prejudice is great."  According to the defendant, the firearm had no connection to the facts of the case and was excluded as the murder weapon.  The defendant also raised the possibility of "guilt by association if [the codefendant's] gun possession[] [is allowed] to be used against [the defendant]."  Evidence of the codefendant's possession of a firearm, he argued, "will give the inaccurate impression that [he] has a similar relationship with firearms.  The prejudicial evidence will taint the jury."

The judge ruled that the evidence of a firearm possessed by the codefendant eight months before the murder was admissible. In reaching this conclusion, the judge found that the firearm "hasn't been ruled out as the murder weapon," and that the

probative value of such evidence outweighed the risk of unfair prejudice. A judge's decision to admit prior bad act evidence is "not disturbed absent palpable error" (citation omitted). Commonwealth v. Holley, 478 Mass. 508, 532-533 (2017). See Commonwealth v. Corliss, 470 Mass. 443, 450 (2015); Commonwealth v. McCowen, 458 Mass. 461, 478 (2010).

Evidence is not admissible if its purpose is solely to establish the defendant's bad character or propensity to commit the charged offense. Commonwealth v. Snyder, 475 Mass. 445, 456 (2016). Evidence of prior misconduct may be admissible, however, to show that the defendant had the means to commit the crime. Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012). A judge has the discretion to allow the Commonwealth to introduce evidence of a weapon that "could have been used in the course of a crime," even without direct proof that the particular weapon was in fact used in the commission of the crime (citation omitted). Commonwealth v. Pierre, 486 Mass. 418, 424 (2020). See Holley, 478 Mass. at 532; Corliss, 470 Mass. at 449-450. "Nonetheless, '[e]ven if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant.'" Pierre, supra at 424-425, quoting Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). See Mass. G. Evid. § 404(b)(2).

Here, the defendant argues that the evidence "at most" pointed to the codefendant's familiarity with weapons. We do not agree with the defendant's assessment of the probative value of this evidence. The judge's finding that the firearm had not been "ruled out as the murder weapon" is supported by the following evidence. First, approximately eight months before the murder, while the codefendant and Ryder were living in Florida, Ryder observed a black handgun tucked in the codefendant's pants when he removed his shirt at a cookout. She also observed the firearm still tucked in the codefendant's pants later that same day while they were in their house. The codefendant explained that it was his friend's gun and that he had obtained it "[f]or protection." Her description of the firearm included a reference to a "spinning thing," permitting the inference that it was a revolver (characterized by its distinctive revolving cylinder). Second, the projectiles found in the SUV were consistent with .38 caliber class ammunition, which commonly is fired from revolvers. Third, investigators responded within minutes to the shooting, searched the area with a canine trained to detect ballistics evidence, and did not locate ejected shell casings. A revolver retains spent casings within the firearm, unlike a semiautomatic pistol that ejects casing through a port when firing. The "evidence was relevant as a link in tending to prove that the defendant committed the

crimes charged" (quotation and citation omitted). Commonwealth v. McGee, 467 Mass. 141, 156-157 (2014).

The defendant further argues that the evidence was not admissible against the defendant because of the risk of guilt by association. He asked the judge to instruct the jury that "if there's evidence against one person, it shouldn't be taken as against the other one."

The judge was not required to instruct the jury that the firearm evidence was admissible solely against the codefendant. In declining the defendant's proposed instruction, the judge reasoned that the Commonwealth had introduced sufficient evidence to establish that the defendant and the codefendant were accomplices in the murder.[7] A jury could have found, based on the evidence reviewed by the judge, that the defendant and the codefendant had different roles in the shooting --the defendant drove the Ford Fusion rented in Maine while the codefendant fired a gun from the passenger's side window.

---

[7] The judge instructed the jury that other evidence of uncharged misconduct, such as gang membership, was admissible on the "limited issues of the defendant's state of mind . . . [and] motive" but "may not be used . . . to infer that either of the defendants is of bad character or has a propensity to commit the crimes charged." There was no request for a similar instruction limiting evidence of the codefendant's prior possession of a firearm to the issue whether the codefendant, or the defendant as a joint venturer, had the means to commit the crime, and not for propensity purposes. The judge was not required to provide such an instruction. See McGee, 467 Mass. at 157; Commonwealth v. James, 424 Mass. 770, 780 (1997).

In these circumstances, evidence that the codefendant had the means to commit the crime (i.e., possessed a revolver) was admissible against his accomplice. For example, in Commonwealth v. Chalue, 486 Mass. 847, 855, 869-873 (2021), we considered the admissibility of photographs of weapons, including a machete, cleavers, and knives, found in the codefendant's apartment a few weeks after gruesome murders where the victims' bodies were dismembered. The defendant argued that the judge's decision to admit the photographs in evidence in his separate trial constituted an abuse of discretion. Id. at 866, 872. Finding no abuse of discretion, we noted that certain weapons "were consistent with the tools used to dismember the victims, and could have served as the means to accomplish the dismemberment." Id. at 872. "Thus, photographs of the machete and cleavers were admissible because these weapons," like the revolver possessed by the codefendant eight months before the shooting, "could have been used in the commission of the crimes." Id. at 872-873.

For the above-stated reasons, we conclude that there was no abuse of discretion by the judge in admitting evidence of the codefendant's prior possession of a firearm.

c. Relief pursuant to G. L. c. 278, § 33E. Having carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to order a new trial

or to reduce the degree of guilt as to the conviction of murder in the first degree.

Judgments affirmed.